UNITED STATES v. BARBER LUMBER CO. et al.

(Circuit Court of Appeals, Ninth Circuit. February 19, 1912.)

No. 1,883.

1. PUBLIC LANDS (§ 138*)—CANCELLATION OF PATENTS FOR FRAUD—BONA FIDE PURCHASER.

A person desiring to purchase a large tract of timber lands of the United States, which are subject to entry under Timber and Stone Act June 3, 1878, c. 151, 20 Stat. 89 (U. S. Comp. St. 1901, p. 1545), may lawfully express such desire to another and contract with him to purchase the lands and advance money to enable the seller to acquire them from the entrymen; and he is not bound to inquire into the method by which such seller acquires title, nor chargeable with any fraud therein, which

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

would render the patents subject to cancellation, of which he has no actual knowledge.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 368; Dec. Dig. § 138.*]

2. PUBLIC LANDS (§ 120*)—SUIT FOR CANCELLATION OF PATENTS—SUFFICIENCY OF EVIDENCE.

To warrant the cancellation of a patent for land issued by the United States for fraud, the evidence must be clear, unequivocal, and convincing, and it cannot be done on a bare preponderance of evidence which leaves the issue in doubt.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 332-335; Dec. Dig. § 120.*]

3. PUBLIC LANDS (§ 120*)—SUIT FOR CANCELLATION OF PATENTS—SUFFICIENCY OF EVIDENCE.

Evidence considered, and *held* insufficient to prove the allegations of the bill in a suit by the government to cancel patents to lands on the ground that title was acquired by fraud in which defendant, which was a subsequent purchaser, participated.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 332-335; Dec. Dig. § 120.*

Bona fide purchasers of public lands, see note to United States v. Detroit Timber & Lumber Co., 67 C. C. A. 13.]

Appeal from the Circuit Court of the United States for the Central Division of the District of Idaho.

Suit in equity by the United States against the Barber Lumber Company, James T. Barber, Sumner G. Moon, William Sweet, John Kinkaid, Louis M. Pritchard, Patrick H. Downs, Albert E. Palmer, and Horace S. Rand. Decree dismissing the bill (172 Fed. 948), and complainant appeals. Affirmed.

The bill in this case alleged that the appellee, the Barber Lumber Company, and others, intending to defraud the United States, combining, confederating, and agreeing together and with Frank Steunenberg, since deceased, John I. Wells, and others, devised a plan whereby by fraud, perjury, and subornation of perjury and other unlawful methods they might unlawfully and fraudulently procure for themselves large quantities of public lands of the United States; that this was to be done by procuring persons to avail themselves of the provisions of the timber and stone act, by filing the written statements required by said act, and doing the other things necessary to obtain title, under an agreement with the appellee and others by which the appellee was to purchase the lands described in the respective statements as soon as the applicants should have secured title thereto; that in some cases the unlawful means consisted in procuring persons to enter land under said act under an agreement with the appellee and its co-conspirators, by which the latter were to furnish and supply to the applicants the money necessary to pay all expenses in connection with the filing upon and procuring title to the lands, including the sums necessary to pay for the lands; and that thereupon the applicants were to deed their lands to the appellee or to others in their behalf. The bill charges that pursuant to that agreement and conspiracy, and to effect its object, those engaged therein fraudulently and corruptly induced the applicants named in the bill, 210 in number, to apply for land under said act and to subscribe to the written statements required thereby, and to state therein that the applicants did not apply to purchase the lands for speculation, but in good faith, and to appropriate it to their own exclusive use and benefit, and that they had not directly or indirectly made any agreement or contract in any way or manner with any person by which the title to be acquired should inure in whole or in part to the benefit of any person except the applicants; that thereafter, in pursuance of the unlawful agreement, and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

to effectuate its object, the appellee procured the entrymen to go to the land office and answer the questions promulgated by the General Land Office, pursuant to the authority vested in it by the timber and stone act; and that each of said persons, in reply to the questions, deposed that he had not sold or transferred his claim to the land for which he made application, that he had not directly or indirectly made any agreement with any person by which the title he might acquire from the government should inure in whole or in part to any person but himself, but that the entry was made in good faith and for his own exclusive use and benefit, and that he paid out of his own individual funds all his expenses connected therewith, and that he expected to pay for the land with his own money. The bill further alleged that the statements made by each of the 210 entrymen, both at the time of making their original filing and at the time of making their final proof, were false and were known to be false by the entrymen and by the appellee and its co-conspirators, and that in truth and in fact divers of the applicants had been supplied and furnished with money with which to pay for said land and the fees and expenses incident to obtaining title thereto by the appellee and its co-conspirators, and that the title to said lands was so obtained by each of the applicants with the understanding that the same should be conveyed at the request of the appellee as soon as title was obtained from the United States. The bill further alleged that the land was so conveyed, and it set up the description of the lands which had been fraudulently procured, with the names of the persons to whom patents therefor were issued.

The answer put in issue the charge of conspiracy to do unlawful acts on the part of the appellee and the other defendants in the suit. The case was tried upon the issues, and a vast amount of testimony was taken. The Circuit Court held that the allegations of the bill were not sustained by the evidence and that the bill should be dismissed. From that decree the present appeal is taken.

The lands embraced in the suit consist of three different groups which were purchased by the appellee at different dates. They are known in the proceedings in the court below as: (1) Boise basin lands, comprising townships 6, 7, and 8 in ranges 4, 5, and 6; (2) Crooked river lands, consisting of townships 6 and 7 in ranges 7 and 8; and (3) Six-Four lands, consisting of lands in township 6 in range 4. The Boise basin lands were opened to entry at different dates between August 1, 1874, and August 9, 1897. The Crooked river lands were opened to entry in March and April, 1897, and the Six-Four lands were opened to entry on September 14, 1903. On August 17, 1901, one Ruick and others organized a railway company which filed a plat of a survey of a railroad into the Boise basin. Soon thereafter Paris & Manning, locators of timber lands, residing in Minneapolis, located on Boise basin lands Patrick H. Downs, Henry Snow, and two women of Minneapolis, and they made initial entries of those lands. And in September, 1901, John I. Wells, a miner, located Jennie E. Wells, his wife, Albert Nugent, Arthur Anderson, Harvey Wells, his brother, James T. Ball, and Abel Edward Hunter on Boise basin lands, for which he received location fees from each. Those entries were subsequently canceled by the land office. About October 1, 1901, Wells and Downs formed a partnership in the location business; Wells going to Boise to solicit applicants, and Downs remaining on the lands to guide entrymen thereto. During August, September, October, November, and December, 1901, and January 1, 1902, 49 locations were made in the basin by Wells & Downs. Before any filings had been made in the Boise basin, a general order had been issued on July 13, 1901, by the Commissioner of the General Land Office, suspending action on all timber and stone entries in Idaho, and requiring all filing and final proof papers to be sent to Washington for approval before the issuance of final receipts so that upon making final proof on these entries no final receipt was issued, but temporary receipts for the purchase price were given. This fact and the general public discussion of land frauds about that time caused some of the entrymen to default upon their payments or to fail to prove up. To meet that situation, Wells made an arrangement with one William Sweet on December 25, 1901, whereby the latter was to furnish Wells with money to loan to such of the entrymen who had filed as were unable or unwilling to pay for their lands. Carrying out that arrangement,

Sweet did furnish Wells, and Wells loaned to the entrymen money aggregating about $12,000 for final payments, as security for which he took the temporary receipts issued by the Land Office.

About January 1, 1902, Wells employed John P. Kinkaid to purchase these claims for him and furnished him money for that purpose. Kinkaid, who was an attorney, advised him that he could not safely buy on the temporary receipts. About February 10, 1902, Sweet formed a partnership with Gov. Steunenberg, to buy lands. About April 1, 1902, Kinkaid returned to Sweet all the money that had been furnished him for the purpose of purchasing land. Steunenberg, soon after making his partnership with Sweet, looked about for financial assistance and procured $15,000 from A. B. Campbell, of Spokane. Campbell about that time met A. E. Palmer of Spokane who had been employed by the North Western Lumber Company of Eau Claire, Wis., a company in which Barber and Moon were actively interested, and who had been requested by the latter to report to them any good lumber proposition he might hear of in the West. Campbell told Palmer of Steunenberg's proposition and offered to turn it over to him, handing him at the same time Steunenberg's report on the timber. On February 21, 1902, Palmer sent this written report of Steunenberg's to Mr. Barber at Eau Claire, and the next day he wrote him that $30,000 worth of timber had already been bought by Steunenberg. Barber directed Palmer to have Steunenberg go to Eau Claire at his expense. On March 6, 1902, Steunenberg arrived at Eau Claire, and he represented to Barber that he and Mr. Sweet had already bought 6,400 acres of land for which they had final receipts, and that they would get deeds when patent issued; that they had kept back a part of the purchase price until the patents should issue; that many timber and stone entries had been made on which final receipts had not issued, but that he believed he could purchase said lands at a price not to exceed $5 per acre when they were on the market; that enough more land could be procured by the use of scrip to make a total of 25,000 acres; that Sweet could not furnish enough money to carry out the scheme, but was willing to sell out. An agreement was thereupon made by which Sweet's interests were to be transferred to Barber and Moon, provided Palmer, after investigation, found Steunenberg's representations to be correct. A contract was drawn up, of date March 12, 1902, was signed by Barber and Moon on that date, and was sent to Palmer with instructions to have Steunenberg sign it if he (Palmer) found things as represented. On April 2, 1902, Palmer reported adversely to the proposition on account of the inaccessibility of the Boise basin timber and recommended buying on the Payette river. Moon wired in reply that if the requisite amount of timber of proper kind could be had in the basin they preferred that to the Payette river timber. Palmer replied that he could close the deal provided it was understood that no patents had been issued, and that the title to the basin lands rested upon receipts. Moon telegraphed Palmer to close the deal if he considered the title good and everything seemed straight. On April 10, 1902, Palmer closed the deal and drew his own checks for about $40,000 to Sweet and Steunenberg, and drew on Barber and Moon for that amount. Thereupon the contract bearing date March 12, 1902, was signed by Steunenberg.

The purport of the agreement is as follows: First, there is recited the fact that there are in the Boise basin many thousands of acres of timber lands upon which is standing and growing pine and fir timber which will average at least 10,000 feet of board measure to the acre, which lands are so situate that the timber thereon may be practically handled and with great profit in logging and manufacturing the same into lumber, and that the title to said lands may be obtained within the next six months at a price not exceeding $5.50 an acre. Second, that Steunenberg, the party of the first part thereto, and one Sweet, are engaged in the enterprise and venture of exploring said lands and obtaining title thereto, and that they have perfected the title to certain of said lands, and have invested therein a large sum of money, approximately $22,000; that Steunenberg and Sweet are willing that Sweet should transfer all of his right, title, and interest in and to the enterprise and in the lands so by him acquired therein either separately or jointly with Steunenberg to Barber and Moon, parties of the second part, for the amount actually invested, together with a profit of 50 per cent. thereon. Third, in the event

that Barber and Moon accept such proposition and pay Sweet the money so invested by him and 50 per cent. in addition, that Steunenberg can and will acquire by good and perfect title, and have vested in Barber and Moon within six months from the date of the contract, 25,000 acres of land, with at least 200,000,000 feet, board measure, of merchantable pine and fir timber, for a price not to exceed $140,000. Steunenberg further agreed immediately to select and locate said lands and to cause good, perfect, and indefeasible titles thereto to be vested in Barber and Moon, and that within six months he would vest in them good title to at least 25,000 acres at a price that should not exceed $6.50 an acre. Steunenberg further covenanted and agreed that the title to all lands acquired under the agreement should be good, perfect, and indefeasible "where such title is or may be derived or obtained from any person or source other than that acquired by or through the location of government scrip." And it was further agreed that when such title was obtained a corporation should be formed to take over said lands, one-quarter of the stock whereof was to be issued for the benefit of Steunenberg but to be held as collateral security by Barber and Moon for money advanced under the agreement. There are other provisions of the agreement not necessary to be set forth.

At the date when the contract was executed, 74 applications had been made of the 92 basin entries involved in this suit, and 50 had gone to final proof. Of the 18 basin entries made after that date, 9 were cases in which the entryman paid his own location expenses and paid the government for the land without borrowing any portion of the funds necessary therefor, and each entryman testified that he had not at any time any agreement, express or implied, whereby any other person had any interest in or lien on the land. As to the other 9, there is no testimony to impugn the good faith of the entrymen. At the time when the contract was executed, no filings had been made in the Crooked river tract, and the Six-Four lands were not yet open to entry. On June 6, 1902, the general suspension order was so far vacated that the local land offices were directed to issue final receipts and certificates on all suspended entries which were not then under investigation by special agents, and final receipts were issued on the 50 suspended entries of the lands in the Boise basin. Thereafter Gov. Steunenberg entered into a contract with Kinkaid, whereby the latter was to be paid $800 for each deed and final receipt which he might procure, embracing timber lands, and, upon delivery of such deeds and final receipts by Kinkaid, Steunenberg paid him therefor, and Steunenberg was reimbursed by Mr. Palmer acting for Barber and Moon. Kinkaid, in carrying out his contract with Gov. Steunenberg, employed L. M. Pritchard to make purchase of all claims offered for sale upon which final receipts had been issued. From June to December, 1902, Palmer paid Gov. Steunenberg in various sums $51,000. On June 9, 1902, Barber and Moon and others organized the Barber Lumber Company, and on July 23, 1902, that company purchased from Barber and Moon the Steunenberg contract, paying them all they had advanced under it, with interest, amounting to $68,853.99, and assuming their obligations under it.

Immediately after making their contract with Gov. Steunenberg, Barber and Moon began purchasing scrip with a view to acquiring 25,000 acres in the Boise basin, and in August of that year, the appellee herein had 6,000 acres of forest reserve lieu scrip, for which $32,100 had been paid. On September 1, 1902, Barber, who was then in Boise, directed Gov. Steunenberg to look over the Crooked river lands, with a view to purchasing timber lands with the scrip; but it was learned that one Downs had located a large number of timber and stone entrymen, covering the most desirable timber lands in that region. Negotiations were entered into for the purchase through Kinkaid of these claims, and Steunenberg finally agreed to pay Kinkaid $950 per claim, and he drew on the Barber Lumber Company for $20,000 for that purpose. Of the 92 Crooked river entries involved in this suit, all but 14 had been filed upon prior to February 11, 1903. The remaining 14 were filed upon in the spring of 1903. The Crooked river lands were purchased during the following summer; the appellee having been unable to use its scrip. On September 14, 1903, the Six-Four lands were opened to entry. The evidence is that the appellee's intention was to use its scrip to take up some of these

lands, and that Downs, knowing of this intention, in order to prevent it, began locating applicants, and located about 27 on September 11th and 12th of that year. Downs employed Kinkaid to make out all the filing papers. On all the Six-Four entries involved in the suit, final certificates were issued in the month of December, 1903. Steunenberg then made another arrangement with Kinkaid to pay him $800 for each deed and final receipt he could procure of the Six-Four lands. In December, 1903, and January and March, 1904, the appellee sent Steunenberg for that purpose $29,200. The evidence is that the appellee paid $800 each for all the claims in the Boise basin, and the Six-Four lands, and $950 each for all the Crooked river lands excepting in a few instances in which it paid more, and that Kinkaid paid from $650 to $750 for the Boise basin and Six-Four lands, and $800 for the Crooked river lands. Beginning in the year 1904, the United States issued patents to all the lands embraced in the suit. There is no evidence that, during the time of these transactions, either Barber or Moon or the appellee had any dealings or correspondence with Kinkaid, Pritchard, Wells, Downs, Sweet, or Martin.

George Wickersham, U. S. Atty. Gen., and Peyton Gordon and A. B. Jackson, Sp. Asst. Attys. Gen.

C. T. Bundy, A. A. Fraser, A. E. Macartney, J. G. Dudley, James H. Hawley, and Roy P. Wilcox, for defendants.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). The court below found the facts substantially as they are set forth in the foregoing statement of the case, and upon examining the record, we find no convincing reasons for disturbing his conclusions. Before entering upon a consideration of the legal conclusions to be drawn from the facts, it will be well to take our bearings in the law applicable thereto as we find them in a series of decisions of the Supreme Court. United States v. Budd, 144 U. S. 154, 12 Sup. Ct. 575, 36 L. Ed. 384; United States v. Detroit Lumber Co., 200 U. S. 321, 26 Sup. Ct. 282, 50 L. Ed. 499; United States v. Clark, 200 U. S. 601, 26 Sup. Ct. 340, 50 L. Ed. 613; Williamson v. United States, 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278; United States v. Biggs, 211 U. S. 507, 29 Sup. Ct. 181, 53 L. Ed. 305. In the Budd Case the record showed that Montgomery wanted to purchase a large body of timber lands, and did purchase them.

"This," said the court, "was perfectly legitimate, and implies or suggests no wrong. The act does not in any respect limit the dominion which the purchaser has over the land after its purchase from the government, or restrict in the slightest his power of alienation. All that it denounces is a prior agreement, the acting for another in the purchase. If, when the title passes from the government, no one save the purchaser has any claim upon it, or any contract or agreement for it, the act is satisfied. Montgomery might rightfully go or send into that vicinity and make known generally, or to individuals, a willingness to buy timber land at a price in excess of that which it would cost to obtain it from the government; and any person knowing of that offer might rightfully go to the Land Office and make application and purchase a timber tract from the government."

In the Detroit Lumber Company Case, an employé of a lumber company told his employer that he knew men who would enter land under the timber and stone act if they could borrow the money to pay for it. The company agreed to loan the money for that purpose, and to take the land at a price that would yield to each entryman a profit

of $40. Entrymen were obtained under that understanding. They were poor, and were unable to pay for the land without borrowing the money. The lumber company paid their traveling expenses in going to the local land office, and loaned to each entryman money to pay for the land. Within a few days after final receipt was obtained, each entryman made a promissory note for the amount he had paid for the land, and a written agreement with the lumber company reciting that he had sold and conveyed unto the company all timber and trees upon the land and the right to enter and take them; that the company would pay him 50 cents per 1,000 feet for the lumber in the trees; that it had paid him the amount which he had borrowed; that it would pay him the balance beyond that amount and 8 per cent. interest in monthly payments as the timber was cut and removed from the land. Upon the execution of the contract, the note was canceled and surrendered. Upon the suit of the United States to avoid the patents which subsequently issued, it appeared that the rights of the mill company in most of the claims so entered had been transferred to a bona fide purchaser, but that there were 17 tracts of land, the title to which had not been so transferred. The court said:

"The evidence in this record has convinced, not that these applicants made any agreements by which the title which they might acquire should inure to the benefit of any person except themselves, but that each one of them applied to enter the lands he or she obtained on speculation for the use and benefit of the Martin Alexander Lumber Company, and not in good faith to appropriate it to his or her own exclusive benefit."

The court, accordingly, directed that a decree be entered avoiding the patents which had issued to those 17 applicants. The Supreme Court, in affirming that decision, said:

"The entire management of these entries was in the hands of an agent of the Martin-Alexander Company. It furnished the moneys both for the purchase prices and all expenses, and it is not easy to believe that it did all this on a mere expectation that after the entries had been made it could purchase the timber. It is a much more reasonable conclusion that it had an understanding with the parties making the entries respecting purchases and prices. * * * We agree with the Court of Appeals that the testimony points strongly to the fact that the entries were in pursuance of an understanding or agreement with the Martin-Alexander Company that, as it was advancing all the money, the entrymen should convey to it the standing timber at a fixed price."

In the Clark Case, notwithstanding that it appeared among other facts that Cobban, who sold timber lands to the appellee Clark, had, before taking steps to acquire a large body of the lands, begun negotiations with Clark with a view to selling them to him, and did thereafter induce a large number of entrymen to take up timber claims that they might sell the same to him and receive $100 each for so doing, and the fact that Clark, at the time when the entries were made, sent his inspector upon the lands to estimate the timber thereon and loaned large sums of money to Cobban with which to make the payments to the Land Office and to the entrymen, the Supreme Court affirmed the judgment of this court (138 Fed. 294, 70 C. C. A. 584) that upon all the evidence there was no ground to charge Clark with participation in Cobban's fraud upon the land laws, and that Clark's knowledge of

the fact that Cobban was carrying out a large and comprehensive scheme to obtain the lands, of the fact that 17 of the deeds were made on one date, 29 on another, and 22 on another, and that all were executed before patents were issued, and many within two days after the execution of the receiver's final receipt, was not sufficient to put Clark upon inquiry as to the method by which Cobban's titles had been acquired.

In the Williamson Case, it was held that, under the timber and stone act, an applicant is not required, after he has made his preliminary sworn statement concerning the bona fides of his application, and the absence of any contract or agreement in respect to the title, to swear again as to such facts on final proof; that a regulation of the Land Office exacting such additional affidavit on final hearing is invalid; and that after an applicant has in good faith made his application he may lawfully contract to convey after patent his rights in the land.

In the Biggs Case, the court reaffirmed the ruling in the Williamson Case, and said that its effect was to hold that the prohibition of the statute applied only to the period of original application, and ceased to restrain the power of the entryman to sell to another and perfect his entry for the purpose of transferring the title after the patent.

[1] The decision of the present case is ruled by the legal principles announced in the Budd Case and in the Clark Case. Those decisions are authority for the proposition that a person or corporation desiring to acquire title to a large body of timber lands of the United States under the timber and stone act may express that desire to another, and may enter into an agreement with him to buy the lands upon his obtaining title thereto, may loan him the money with which to acquire title, and may inspect and select the lands, and that such person or corporation is not bound to inquire into the method by which the other party to the contract acquires title, and is not chargeable with knowledge of any fraud upon the land laws that he may resort to, and that in taking titles based upon the issuance of final receiver's receipts to the entrymen without actual knowledge of such fraud or of facts sufficient to put one upon inquiry, such person or corporation is an innocent purchaser of the lands. The contract which was made between Steunenberg and Barber and Moon was similar to that which Clark had with Cobban in United States v. Clark, and, under the authority of that decision, we hold that it was not a conspiracy to accomplish by concerted action an unlawful purpose, as urged by the appellant herein, and that it was justifiable. That contract contemplated the acquisition by Barber and Moon of the 6,400 acres which Steunenberg represented that he had already purchased, and 5,000 acres in addition which had then been filed upon, and which he contemplated purchasing after final proofs. The contract called for 13,600 acres more, and the court below found from the evidence that that was to be obtained by the use of scrip. But assuming that it was to be obtained by entries under the timber and stone act, and that it was so obtained, there is no substantial proof that Steunenberg resorted to means not warranted by the decision of the Supreme Court above cited. He could rightfully go into the Idaho timber country and make known generally his willing-

ness to buy timber lands at a price in excess of that which it would cost to obtain it from the government, and persons knowing of that offer might rightfully go to the Land Office and make application, and purchase a timber tract for the purpose of selling it to him.

Several facts and groups of facts disclosed by the evidence are relied upon as showing that Barber and Moon must have been members of, or cognizant of, a scheme to obtain timber lands in violation of the timber and stone act. One is that Wells and Downs located substantially all of the entrymen whose claims are involved, that Kinkaid and Pritchard purchased all the claims, and took deeds in the name of Rand, Long, or Palmer, each of whom was acting for the appellee. But these facts do not necessarily tend to prove that the original entrymen or Wells and Downs were the agents of Barber and Moon or of the appellee in locating the lands, or in paying for the same, or that Kinkaid was the agent of the appellee in buying the lands from the entrymen. United States v. Clark, supra. Downs and Wells both testified that they were employed only by the entrymen, that their only interest was to obtain the location fee of $25 for each location, and that they had no dealings of any kind whatever with Kinkaid, Pritchard, Steunenberg, or Barber and Moon.

Another circumstance relied upon is that on September 12, 1903, which was three days before township 6, range 4, was opened to entry, Barber, at Eau Claire, Wis., gave to one Hosely, who was employed by the appellee to go into the basin and Crooked river country in Idaho, and report on the quality and quantity of timber on the appellee's lands and the feasibility of logging and driving the same by water, a plat book of the appellee's lands, including a plat of township 6–4, on which, it is alleged, many quarter sections were indicated by marks in red ink, showing, it is said, that Barber knew in advance the lands which Downs was to locate, and which he subsequently did locate. All this, if true, would not be sufficient to charge the appellee with fraud in obtaining title to those lands. United States v. Clark, supra. But the evidence does not show it to be true. Hosely, although he admitted when testifying that he had at some time after arriving in Idaho told the receiver of the Land Office that the red ink marks on the plat of township 6–4 were there when Barber gave him the book, and that he so believed at that time, testified that he was mistaken in so stating, and that the marks were not, and could not have been, on the book when it was given to him, but must have been put there by some one after his arrival in Idaho. His testimony appears to be corroborated by the nature of the entries in the book, for the marks in red ink on the plat of township 6, range 4, are made in a different manner and in a different shade of ink from the entries on the other township plats.

Reference is made to the letter of May 21, 1902, which Barber wrote to Palmer, saying:

"It is our idea to push the location of the timber lands as rapidly as can be done intelligently, and, with this in view, we hope to send you another estimator in a few days."

In his testimony Barber stated, in explanation of the letter, that the locations so referred to were locations to be made by the use of scrip,

and that they were planning all the time to file lieu land scrip upon all the lands which had not been filed upon, and that, in order to place the scrip intelligently, it was necessary to cruise the land. In corroboration of this there is the letter of Barber to Palmer of May 21, 1902, stating that the scrip might be placed on single forties in different sections and townships; "the only condition being that if the scrip in question calls for 3,000 acres more or less, as the case may be, 3,000 acres must be entered at one time. The question now before us is: Are you prepared to take up 3,000 acres of government lands in the Boise basin under the conditions as stated above?" The appellant contends that the testimony to the effect that the appellee or Barber and Moon at any time intended to use scrip in the acquisition of lands in Idaho should be discredited, and the testimony of Taylor, one of their employés, which is relied upon as corroborating the evidence that there was an intention to use scrip, is pointed at as indicating the contrary, because, it is said, he was employed in October, 1902, to cruise land in the Crooked river country with a view to using scrip on the lands if they were found desirable, and he did not make his report until December 5, 1903. The inference sought to be drawn is that he was not acting in good faith, but Taylor testified that after he had been in the Crooked river country about 10 days, he found that there had been a considerable number of stone and timber entries taken which did not appear on the plats which he had, and that therefore he returned to Boise, and, on examining the records, found that practically all the lands which were valuable for timber had been entered by entrymen under the timber and stone act, and that for that reason he informed Steunenberg that it would be useless to go back. The appellant points to the evidence showing that after that date a large number of entries were made, some of which were subsequently acquired by the appellee; but we do not think that fact should be taken as disproving the testimony that the appellee did, in good faith, make an effort to acquire Crooked river lands by scrip. That the locations referred to in the letter of May 21, 1902, were to be locations by the use of scrip is corroborated by contemporaneous correspondence and by the fact that Barber and Moon had acquired a large amount of scrip. There is evidence, it is true, tending to prove that many of the entries in the Crooked river country of land which the appellee subsequently acquired may have been made in violation of the provisions of the timber and stone act, as was the case in United States v. Clark; but the decided weight of the testimony is that such illegal action, if such there were, was induced by the locators Downs and Wells for their own individual advantage, and not at the instance of Barber and Moon or the appellee or to their knowledge.

A circumstance relied upon is the refusal of L. G. Chapman to produce the books of the appellee before a certain grand jury in April, 1907. Chapman came from Wisconsin to Idaho as manager of the appellee in August, 1903. He was subpœnaed to produce before the grand jury all books of account, correspondence, and papers of the appellee, and he did so. The grand jury was investigating the proceedings whereby the Barber Lumber Company had acquired title to tim-

ber lands in Idaho. The court ordered Chapman to submit the books and papers to the grand jury. He refused on the ground that they might tend to incriminate him. The argument is that those books, papers, and correspondence, if they tended to incriminate Chapman, must also have shown evidence of fraud upon the part of the appellee in acquiring the lands, and reference is made to the letter of Barber to Chapman of April 26, 1907, in which he said:

"I want to thank you for the members of the company, and particularly for myself, for the position you took and your courage and dignity with which you carried through the consequences. It is not pleasant to be practically in jail, and I can assure you that your course is most heartily approved by all the members of the company."

But Chapman appeared as a witness in the present case, and explained why he had thought the ledger, cashbook, and journal might, if improperly used, have tended to incriminate him; but he stated that there was nothing in them which he regarded as tending to incriminate him in any offense against the United States. The complete answer to the contention is that on the trial in the court below, all the correspondence, books, and papers called for by the appellant were produced. The real question is: What is in fact shown by those books and papers —not what Chapman at one time thought might be their effect.

Another group of facts relied upon is the following: Special Agent Louis L. Sharp, who had received his appointment at the instance of United States Senator Foster of the state of Washington, had been sent to Idaho to investigate certain entries under the timber and stone act. At his request the local land office withheld receiver's final certificates on 12 claims. At that time Gov. Steunenberg desired that these suspended claims be either allowed so that he might purchase, or canceled so that he might buy with scrip. On June 28, 1902, Barber wrote Senator Spooner a letter in which, after referring to his efforts to obtain timber lands in Idaho, and stating that some time before he began the investigation of that country, a large number of miners, who were out of employment, had located claims on government land under the timber and stone act, he said:

"And of course they have selected the best timber in that locality, and we are anxious to buy them out as soon as they secure title to their land. These titles are long past due and in the Boise land office, and are held up for some reason. * * * This investigation is in the hands of one L. L. Sharp. * * * We would like to have this matter settled at once, by telegraph if possible, so that we can either scrip these claims, or buy them of the claimants, and go on with our plans, and to this end we would like to have the secretary order this man Sharp to report in Washington, D. C., or anywhere else out of the Boise district."

On July 7, 1902, Moon telegraphed to Steunenberg at Boise:

"Have taken up matter by letter with three parties in Washington."

It appears that the three parties were Sen. Spooner, Sen. Allison, and "some Minnesota man known to Mr. Macartney of St. Paul, who was the Barber Company's attorney, and a partner of Sen. Clapp of Minnesota." Two or three days later, Steunenberg telegraphed from Washington to Moon at Eau Claire:

"Situation here most satisfactory, and party recalled."

On July 9, 1902, Barber wrote to Clapp & Macartney, attorneys at St. Paul:

"It seems to me that our affairs are in a critical state when energy and prompt action may mean a good deal to us."

On July 17th he wrote to Steunenberg:

"I cannot close this letter without congratulating you upon the improved condition of matters in the land office at Boise."

On July 17, 1902, Moon wrote to Palmer at Spokane:

"We have organized as Barber Lumber Company at Eau Claire, Wis., and think you had better take the deeds from the entrymen in your name, and have them recorded. Then you in turn deed to the Barber Lumber Company. I don't think it would be advisable for us to have these deeds go on record for the present, do you?"

But Sharp was not recalled. Steunenberg, while in Washington, met A. B. Campbell, of Spokane, and stated to him his difficulties, saying that there was a man by the name of Sharp, a timber inspector, who had been giving him a good bit of trouble, and he requested Campbell to see Sen. Foster and induce him, "instead of fighting him, try to help him secure this." Campbell communicated with Sen. Foster, and the latter agreed to have Sharp call upon Campbell at Spokane "and talk this over." Steunenberg also went to see Sen. Foster at Tacoma. According to Sen. Foster, Steunenberg proposed only that the matter be placed before Sharp in such a way that he (Steunenberg) could get a fair show. "He never made any intimations that he wanted Sharp to do the wrong thing, or anything of the kind." On September 15th Steunenberg wrote to Campbell:

"I have faith that through the work of yourself and friends, we will have a solution—now, that we have a pointer on the inspector and those who are responsible for his appointment."

On October 31, 1902, Steunenberg wrote to Campbell:

"If not asking too much, wish you would ask Sen. Foster to hold Sharp off until I can meet the Senator."

In November Steunenberg went a second time to see Sen. Foster at Tacoma, and requested that he see Sharp. The Senator arranged for a meeting with Sharp, and when at that meeting Sharp said that he had made some adverse reports, and was going to make others, the Senator in reply told him that he could not report a bad entry good, being government inspector.

"'But,' I says, 'be sure they are bad, that is all. You want to make investigations in such a way that you know what you are about.' And I told him to go and see Mr. Campbell."

He went to Campbell, and was asked what the trouble was with those claims. Campbell testified that Sharp answered that there were four or five of the entries that he was unable to approve, and that he then asked Sharp if he would not go to Gov. Steunenberg and "tell him the facts and not get him into trouble." At that time Campbell, so he testified, handed Sharp two $100 bills. But Sharp's actual expenses on account of meeting with Foster and Campbell were about

$75, and he testified that Campbell paid him but $100. Campbell was reimbursed by Steunenberg, and the latter in his account with the appellee charged the $200 as attorney's fees. Sharp returned from Spokane to Boise, but the 12 entries on which adverse reports had been made remained suspended. The receiver, Mr. Garrack, testified that after Sharp's visit to Spokane "his attitude did change, because after that he hesitated about pushing the cases. * * * I believed at that time, and I believe now, that Mr. Sharp was intimidated in a way from doing his duty, and that he said he was between the devil and the deep sea—his Senator on one side, and he didn't know whether the Commissioner would uphold him on the other." Now, the most that can be claimed for all this evidence is that Barber and Moon and Steunenberg were willing to resort to the means which the testimony indicates to remove obstacles to the allowance of certain entries of lands which Barber and Moon had bought. upon the strength of temporary receiver's receipts with the understanding at the time, as they testified, that the receipts were receiver's final receipts. As matter of fact, they never did acquire the lands under the entries so suspended, and those lands are not involved in this suit. There is no evidence that Sharp found fault with any of the entries of the lands which were finally patented to the appellee.

[2] In Maxwell Land-Grant Case, 121 U. S. 325, 381, 7 Sup. Ct. 1015, 1029 (30 L. Ed. 949), the court said:

"We take the general doctrine to be that when in a court of equity it is proposed to set aside, to annul, or to correct a written instrument for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal, and convincing, and that it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt. If the proposition, as thus laid down in the cases cited, is sound in regard to the ordinary contracts of private individuals, how much more should it be observed where the attempt is to annul the grants, the patents, and other solemn evidences of title emanating from the government of the United States under its official seal. In this class of cases, the respect due to a patent, the presumptions that all the preceding steps required by the law had been observed before its issue, the immense importance and necessity of the stability of titles dependent upon these official instruments, demand that the effort to set them aside, to annul them, or to correct mistakes in them, should only be successful when the allegations on which this is attempted are clearly stated and fully sustained by proof."

The doctrine of that decision has been reaffirmed in numerous subsequent cases. United States v. Stinson, 197 U. S. 200, 25 Sup. Ct. 426, 49 L. Ed. 724, and cases there cited.

[3] Measured by the standard thus established, the evidence in the present case falls short of sustaining the allegations of the bill.

The decree of the court below is affirmed.