NORTHERN COLORADO COAL CO. v. UNITED STATES.

UNITED STATES v. NORTHERN COLORADO COAL CO. et al.

(Circuit Court of Appeals, Eighth Circuit. May 1, 1916.)

Nos. 4437, 4438.

1. PUBLIC LANDS ☞120—SUIT FOR CANCELLATION OF PATENTS—BURDEN OF PROOF.

Where the United States has shown that patents to public lands were obtained fraudulently, a subsequent purchaser, claiming through the patentees, has the burden of proving affirmatively that he was a good-faith purchaser.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 332–335; Dec. Dig. ☞120.]

2. MINES AND MINERALS ☞45—SUIT FOR CANCELLATION OF PATENTS—BONA FIDE PURCHASER.

A coal company acquired a bond for a deed to a large quantity of land, 800 acres of which was then a part of the public domain and was known coal land. Subsequently the obligor obtained patents through dummy locators and conveyed the land to the company. *Held*, that the company was chargeable with knowledge of such facts that it was not entitled to protection as a bona fide purchaser.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 131; Dec. Dig. ☞45.]

3. MINES AND MINERALS ☞11—ENTRY OF COAL LANDS—CORPORATIONS.

A corporation, which purchased coal lands previously patented to other entrymen, did not by such act "take the benefit" of the statute authorizing a single entry only by an association or its members, within the meaning of Rev. St. § 2350 (Comp. St. 1913, § 4662), so as to disqualify its stockholders from making personal entries.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 14, 17; Dec. Dig. ☞11.]

Appeal from the District Court of the United States for the District of Colorado; Robert E. Lewis, Judge.

Suit in equity by the United States against the Northern Colorado Coal Company and others. From the decree, both parties appeal. Affirmed.

John A. Gordon, Asst. U. S. Atty., of Denver, Colo. (Harry B. Tedrow, U. S. Atty., of Denver, Colo., on the brief), for the United States.

Henry McAllister, Jr., of Denver, Colo. (N. E. Corthell, of Laramie, Wyo., and Joel F. Vaile and William N. Vaile, both of Denver, Colo., on the brief), for defendants.

Before CARLAND, Circuit Judge, and AMIDON and VAN VALKENBURGH, District Judges.

AMIDON, District Judge. This is a suit brought by the United States to cancel patents for 1,280 acres of coal land situated in Larimer county, Colo. Title to 800 acres of the property is held by the defendant Coal Company as purchaser. The remaining 480 acres is held by the defendants Miller, Peters, and Smith under patents issued upon their individual entries. The bill asserts that the company derives its title through dummy entrymen, and further asserts that the individual defendants at the time they made their entries were stockholders of the Coal Company; and as it had already acquired coal lands in excess of the 320 acres allowed by the United States Revised Statutes, §§ 2348–2350 (Comp. St. 1913, §§ 4660–4662), they, as stockholders, were disentitled to file individual claims. The trial court entered a decree in favor of the government against the Coal Company, canceling the patents under which it claims, and dismissed the bill on the merits as against the individual defendants. Cross-appeals are brought to review the decree.

To understand the case the facts must be stated more fully. Two brothers by the name of Riach executed a bond for a deed in favor of a Mr. Lee, bearing date December 16, 1902, binding them to convey to him by perfect title 4,240 acres of land, specifically described by tracts, and including the 800 acres involved in this suit. The bond was acknowledged and presumptively delivered January 9, 1903. On December 26, 1902, Mr. Lee organized the defendant corporation, and became its secretary, and a member of its board of directors. January 15, 1903, he entered into an agreement with the company binding himself to convey to it 3,600 acres of land, including 160 acres of the 800 acres here involved, also three mining claims, and a controlling interest in the stock of a gold and copper mining company. This agreement is acknowledged and was presumptively delivered March 22, 1903. August 5, 1904, Lee released the company from all existing obligations under this contract. On the same day he assigned to it his bond with the Riachs, the company acquiring all his rights and assuming all his obligations under the bond.

Nearly two years afterwards one of the brothers, James C. Riach, employed dummy entrymen to give him the use of their names for the purpose of acquiring title to the 800 acres under the coal land statutes. These entrymen appointed Mr. Riach their attorney to make and perfect the entries. He paid all the expenses and the purchase price of the land. The first of the entries was made in April, 1905, three of them in March, 1906, and the fifth in August, 1906. Receiver's receipts were issued on the first claim in April, 1905, and on the other claims in 1906, at about the time the entries were made. As soon as the receiver's receipts were issued, deeds were executed for the property by the several entrymen to James C. Riach. Patents

were issued on the five claims as follows: Three in August, 1906, and two in July, 1907. James C. Riach executed a warranty deed for the 800 acres to the company in October, 1907.

[1] It is conceded that under the law as declared by the Supreme Court in U. S. v. Keitel, 211 U. S. 370, 29 Sup. Ct. 123, 53 L. Ed. 230, and U. S. v. Munday, 222 U. S. 175, 32 Sup. Ct. 53, 56 L. Ed. 149, the patents as against the entrymen and Riach are void. The Coal Company must prevail, if at all, as a good-faith purchaser. The law in regard to that defense, when title is derived through fraudulent patents, has been greatly clarified by the decision of the Supreme Court in Wright-Blodgett Company v. United States, 236. U. S. 397, 35 Sup. Ct. 339, 59 L. Ed. 637. In many opinions language will be found to the effect that, when the government seeks to set aside a patent for fraud, the respect due to such instruments and the stability of titles emanating from the government demand that the case be established by clear and convincing proof. This rule has sometimes been extended so as to require the government to show, not only that the patent was obtained by fraud, but also that a purchaser acquiring title upon the faith of the patent had actual notice of the fraud. Such is not the law. All that the government is required to do is to show that the patent was obtained by fraud. It is then entitled to a cancellation of the patent, except as against a holder who can show that he acquired title to the land as a good-faith purchaser. That defense is affirmative. The burden of proving it rests upon the purchaser. The government is not required to show that he took the title with notice of the fraud. On the contrary, the burden is upon him to show that he acquired the title for a valuable consideration and without notice. Under the law as thus declared in the Wright-Blodgett Case, the government here is entitled to a cancellation of the patents, unless the coal company has shown by a preponderance of the evidence that it is a good-faith purchaser. Has it discharged that burden? For two reasons we think the trial court properly held that it has not.

[2] First. By taking from Mr. Lee the assignment of his bond for a deed, the Coal Company stepped into his shoes and sustains the same relations to the lands which he sustained. At the time this assignment was made the lands were still a part of the public domain, and remained such for nearly two years before the fraudulent entries were made. The company had actual knowledge that the lands were public lands. This is a fair inference from the language of the bond for the deed, and from the whole course of dealing between the parties. The officers of the company were also intimately familiar with the lands. Mr. Miller, its vice president, had visited the properties from time to time every year subsequent to the year 1902. He also had a coal claim of his own, which was situated within one mile of the several tracts which made up the 800 acres. During all of this time he was on intimate terms with James C. Riach, and made his home when visiting the property at Mr. Riach's house. Other officers of the company had a similar, though less extensive, knowledge of the properties. What is the fair import of the bond for a deed in the light of this

knowledge? The company knew that the land was coal land, and that title could properly be obtained for it only in accordance with the coal land laws. These laws limited Mr. Riach to 160 acres, and he had already exhausted that right. The only way in which he could acquire the title called for by his bond was to induce other entrymen to make entries for his benefit. The direct effect of the bond for a deed was to induce the Riachs to do just what they did. There was no other way in which they could fulfill their contract. Notwithstanding the protests of the officers of the company that they did not know the entrymen personally, and did not know of the specific fraudulent acts of the Riachs, it is incredible that they did not intend that the Riachs should get title by means of entrymen who should be at all times under their control. Counsel say in their brief:

"The Riachs contract did not require that Riach must pursue a dishonest course in order to comply with its terms. It was entirely possible that other persons might in their own interests lawfully acquire these lands before Riach was obliged to convey title under his contract, in which event he would have to treat with them in order to fulfil his contract."

But is that argument based upon reasonable probability? Did the company intend that the Riachs should wait until independent entrymen should file upon these lands, and then take the chance of acquiring title from them, after they had obtained title from the government? To indulge in such an assumption would render the contract itself illusory. Whether the company would ever get title to the property would depend upon two events, indefinite in time and wholly beyond the control of the company and its vendors, viz.: First, the making of entries by independent entrymen; and, second, the willingness of such entrymen to part with their title after they had obtained it from the government. If the law is a practical science, courts must draw from circumstances and proofs the inferences which sensible and experienced men would draw from them. Acting upon that principle, it is our judgment that the bond for a deed contemplated that entries should be made for the benefit of the Riachs, and be at all times subject to their control. Upon that interpretation the bond was an illegal contract because of its natural and probable tendency to induce a violation of the law. By acquiring that bond the Coal Company became a party to its illegal purpose.

The defendants here crossed the line to which defendants in United States v. Clark, 138 Fed. 294, 70 C. C. A. 584, Id., 200 U. S. 601, 26 Sup. Ct. 340, 50 L. Ed. 613, and United States v. Barber Lumber Company, 194 Fed. 24, 114 C. C. A. 44, drew perilously near. In those cases, however, there was no contract to convey specifically described portions of the public domain. In the Clark Case the defendant loaned money to one Cobban, and knew that it was to be used by him in acquiring lands, and there was further an understanding between them that Clark would purchase timber lands of Cobban if, upon inspection, the timber and the title were found to be satisfactory; but there never was, at any time, any agreement between them for the acquisition or conveyance of any specific tracts of public lands,

and all the courts found as a fact that Clark had no knowledge of any fraudulent practices of Cobban. In the Barber Lumber Company Case defendant went one step nearer the line. In that case the defendant entered into a contract in writing with one Steunenberg for the conveyance within six months of 25,000 acres of timber land. At the date of the contract the vendor had title to only 6,400 acres of the land and claims had been filed on only 5,000 acres more. This left 13,600 acres for which entries would have to be made and title obtained. The contract, however, did not relate to any specific parcels of the public domain and the evidence clearly showed that the entries had been and were being rapidly made by persons acting independently of both Steunenberg and the defendant, and in antagonism to them. In the present case the bond was between defendant and the Riachs, and bound them to acquire and convey title to specific tracts of coal land, which at the time were part of the public domain. For reasons which we have already explained, we think this contract contemplated a violation of the coal land statutes.

Second. The trial court found, and in our judgment, was amply justified by the evidence in finding, that the Coal Company had actual knowledge of the fraudulent practices of James C. Riach in obtaining the patents for the land. As already stated, Mr. Miller, its vice president, was on the most intimate terms with Riach during all the time down to the issuance of the patents. When examined as to whether he ever talked with Mr. Miller in regard to the character of the entries, Mr. Riach's testimony is evasive. Again and again he was asked whether he discussed that subject with Mr. Miller, and he evaded answering the question. Finally, when pressed, he stated that he thought there was some discussion of the subject. Mr. Miller testified at first that there was no such conversation, but, when pressed, he would do no more than say that he did not remember any such conversation. A plat of the various lands will show how important the 800 acres were to the entire coal property. It is incredible to us that the subject was not fully discussed between the Riachs and the officers of the company. The company was paying out large sums of money for the title before the entries were made and while they were pending. It would require us to depart from the ordinary inferences of life to believe that the company did not keep itself informed as to the steps which were being taken to obtain the property for which it was paying. If its officers did not acquire such knowledge, they studiously avoided doing so for the purpose of making the defense which they have interposed in this suit.

Some point is made of the fact that under the bond for the deed the consideration was double the purchase price paid to the government, and under the contract with Mr. Lee it was some four times the price fixed by the statutes for coal lands. The evidence does not support this argument. It is based upon the assumption that all the lands were of equal value. The contract, however, with Mr. Lee, covered gold and copper mining properties, and a controlling interest in a mining corporation. Both the bond and the contract also covered

water rights. We cannot attempt, therefore, to apportion the consideration and assume that all the lands were of equal value. So far as the evidence shows, the consideration paid for the lands here involved may have been no greater than that paid to the government.

In our judgment, the decree canceling the patents for the 800 acres was right, and should be affirmed.

[3] The other branch of the decree requires only a few words. The appeal of the government rests upon the theory that the Coal Company in acquiring title to the 800 acres "took the benefit" of the coal land laws within the meaning of that phrase as used in section 2350 of the Revised Statutes. We do not think this contention is sound. In our judgment the phrase quoted requires that the corporation shall either file an association claim itself, or that it shall directly cause such a claim to be filed by others for its benefit. The Coal Company here obtained its title not as a locator but as a purchaser. It did this, however, with guilty knowledge, both actual and presumed, of the fraud practiced by its grantor. But, as it took as purchaser, it cannot properly be said to have "taken the benefit of the act," which requires that title shall be obtained either directly or indirectly by location.

In the briefs there is some argument of the question whether a person who becomes a stockholder in a corporation that has previously taken out an association claim under the coal land laws becomes disentitled to file an individual claim. We do not deem it necessary to decide that question in the present case. It can properly be disposed of without such a decision, and we deem it better to defer deciding the question until its decision shall become necessary.

The decree of the trial court will be affirmed upon both its branches.