Mr. Justice GRIER
 

 delivered the opinion of the court.
 

 ' A brief history of the conceded facts of this case; anterior to the filing of the amended bill, may save the trouble of a more tedious analysis of the bill and answer, with their numerous amendments, and tend to elucidate the merits of the case and the questions decided by the court.
 

 John O. Page, the complainant’s intestate, was a merchant in Hallowell, Maine. He built and owned shares in vessels employed in trade, and had a retail shop or store, which, for some years before his death, was managed by his. brother, Rufus. K. Page. In 1810, John O. Page went to England, leaving his business chiefly in the care of bis brother, and died there, in February, 1811, intestate, leaving a widow and three minor children. Sarah Page, the widow, took out letters of administration on the estate. TSfie filed an inventory of the property, amounting to the sum. of $ 64,000, and charged herself with additional receipts of cash in the administration accounts after-wards filed, showing the whole amount of the estate to be over $ 80,000.
 

 Rufus K. Page claimed to .have been a partner with his brother in. the store, by a parol agreement with him, whereby John should furnish the capital, and Rufus conduct the business, dividing the profits, five eighths to John and three eighths to Rufus.
 

 " The sureties of Sarah Page in hér administration bond were Nathaniel Dummer, her father-in-law, and Thomas Bond, Esq., her brother-in-law, who also aided and'counselled her in settling the estate. In February, 1812, Chandler Robins, register of .the Probate Court, and John Agry, a respectable merchant and ship-owner, were mutually chosen by the adminis-tratrix and Rufus K. Page to settle all. accounts between the estate of John Ó. Page and Rufus K. Page. By. their settlement or award, Rufus was charged as debtor to John,—
 

 
 *827
 
 For advanced to store, § 10,769.00
 

 For five eighths of profit's of store, 12,934.00
 

 Amounting in all' to . . . ... §23,703.00
 

 From, which was deducted John’s debt to store, 7,828.00
 

 Leaving a balance due by Rufus to the estate, § 15,875.00
 

 After adding and subtracting various other matterá . óf account not connected with the partnership, they found the balance due. by.Rufus to the estate to be §17,190, of which §8,106 was cash, and the remainder, §9,084, consisted of . John’s share of the notes and accounts due to the store, and which Rufus retained in his hands for collection. The firsf administration account filed by Sarah Page acknówlédges the receipt in cash of the sum of §8,106 from R. K. Page, and the accounts after-wards filed show that she had received the balance of § 9,804, partly in -cash and partly in notes.
 

 Sarah Page settled the final account of her administration on the 20th of February, 1816. She died in 1826. In 1828, •Stearns, the complainant, intermarried with Louisa, one of the daughters and heirs of John O. Page. In 1834, he took out letters of administration
 
 de bonis non on
 
 the estate of John' O. Page, for the purpose of prosecuting claims under the treaty of the United States with France. After this, he commenced an examination of the administration accounts of- Saráh Page, and began to entertain-suspicions that Rufus K. Page had taken advantage of her ignorance of accounts, and had defiauded her in his settlement. And finally, at November term, 1838, more than twenty-six years after the settlement of defendant’s account with the administratrix, this bill was filed against Rufus K. Page for a discovery and account.
 

 The amended bill abounds in general charges of fraud against the defendant; alleges that he concealed from the administra-trix, the true state of. the affairs of the deceased, which had been intrusted to his care; that the partnership claimed by him with the deceased was a false pretence, “and that the said Sarah did not distrust, or had it not-in her power to disprove, the same ”; that the accounts exhibited of the partnership transactions wére totally false and fraudulent in their statements and aggregates, calculated and designed to deceive and mislead.
 

 It charges, also,,. that some ten thousand dollars of private debts due by Rufus to John were intermingled with the partnership accounts so as to produce an erroneous result, and that he had sold and converted to-'his own use the' brig Emmeline, which was owned, in whole or in part, by John, and rendered no account of the same.
 

 
 *828
 
 Afterwards, in October, 1841, by a further amendment to the bill, the'complainant admits, that, “from means of information which he now has,” there was a partnership between John and Rufus, but insists that the profits were to be divided between them in the ratio of two thirds to John and one third to Rufus.
 

 The defendant, in his answer, after denying the general charges of fraud and mistake, asserts, that he entered into partnership, -by parol agreement, with his brother, John, in 1806; that the business of the firm was transacted in the name of Rufus K. Page ; that' John advanced the capital, and Rufus superintended and conducted the business of the store, and the profits thereof were to be divided fivd eighths to John and three eighths to Rufus; that the books of the firm were kept on these principles, and always open to the inspection of John, and frequently examined by him; that when John advanced money or goods for the use of
 
 the
 
 firm, he took -the notes of the firm; and that defendant gave notes
 
 to
 
 John for goods and money supplied, and (to use his own phrase) “ for equalizing the capital,” to the amount of over ¡$ 10,000; that immediately ■ on the announcement of the death of John O. Page, an inventory of the goods in the store was taken and placed in the hands of Bond, the attorney of Sarah Page, the administratrix; that he afterwards settled fully and fairly all accounts with the administratrix and her attorney, and produces the books, and the statement of their final settlement as made out by Robins and Agry, the referees chosen by the parties to make the- settlement and adjust- the accounts, and shows, moreover, by the administration accounts filed by said Sarah, that he had paid her the balance of over $ 17,000 found to be due b-y him according to the account thus stated.
 

 He asserts, moreover, that John owned but one half of the-brig Emmeline, which the administratrix afterwards sold' to the defendant for the sum of $ 3,000, with which she charged herself in her administration account. And finally, the answer relies on the settlement of accounts thus made' more than twenty-five years before the filing of the bill, as a bar to all further account, especially-after so great a lapse of time, when papers are lost, witnesses dead, and transactions forgotten, and pleads the statute of limitations.
 

 . Statutes of limitation form a part of the legislation of every government, and are necessary to the peace and repose of so.ciety. When they are addressed to courts of equity as well as to courts of law, as they seem to be in all cases of concurrent jurisdiction (as in matters of account), they are equally, obligatory on each court. In other cases, courts of equity ací lipón
 
 *829
 
 the analogy of limitations at law, and sometimes upon their own inherent doctrine.of discouraging, for the peace of society, antiquated demands, by refusing to interfere’ where there has been gross laches or unreasonable delay. They also interfere in many cases to prevent the bar of the statutes, where it would be inequitable, or unjust: as, for example', if a party has perpetrated a fraud which has not been discovered till the statutable bar may apply to it in law, courts of equity will "inurpose and remove the bar out of the way of the. injured party. In cases of mistake also, as well as fraud, they will not consider the-statute as running till after the discovery of the mistake, as laches cannot be imputed to the injured party till the discovery of the fraud or mistake has been made. 2 Story’s Eq. <§> -1520. ' But as lapse of time necessarily obscures the truth and destroys the evidence of past transactions, courts of chancery will exercise great caution in sustaining bills which seek to disturb them.' They will hold the complainant to stringent rules of pleading and evidence, and require him to make out a clear case.. Charges of fraud are .easily madé, and lapse of time affords no reason for relaxing the rules of evidence or treating mere suspicion, as proof. If a defendant can be compelled to open settled accounts, to explain or prove' each item, after a lapse of near thirty years, by general, allegations of fraud, — if the fraud can be proved by his inability to elucidate past transactions after so great a length of time, Or by showing some slips of recollection, or by contradicting him in some collateral facts by the-frail recolléction of other witnesses, — no man’s property, or reputation would be safe.
 

 A complainant, seeking the aid of a court of chancery under.' such circumstances, must state in his bill distinctly the particular act of fraud, misrepresentation, or concealment, — must, specify bow, when, and in' what manner,, it was perpetrated. The charges must be definite and reasonably certain, capable of proof, and. clearly proved.' If a mistake is alleged, it must be stated with precision, and made apparent, so that the court may rectify it with' a feeling of certainty that they, are not committing another, and perhaps greáter, mistake. And especially must there be distinct averments as to the time when the fraud, mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly, see, whether, by the exercise of ordinary diligence, the discovery might not have been before made.
 

 Every case must, of course, depend on its own peculiar circumstances, ánd there would.be little profit in referring to the very numerous cases to be found in the books on this subject. In the case of Michoud
 
 v.
 
 Girod, 4 How. 504, lately decided in'
 
 *830
 
 this court, transactions were investigated after a lapse of more than twenty years; but-the facts proving the fraud were all on record, and were not disputed. The false accounts made out against- the estate of th& deceased by the executors were on file, and their iniquity was apparent on their. face. Moreover, the complainants resided in Europe, and were' kept in ignorance of their rights, and hindered from prosecuting them by the promises, threats, and fraud of the guilty parties.
 

 In this case, the complainant seeks to open an account stated and settled -twenty-six years before the filing of his bill, and this account not rendered by the defendant to a woman unác-quainted with business, and received by her without examination, but stated from the books, by referees or arbitrators chosen for the purpose, and in the nature of an award between the parties, executed and acquiesced in by' both without complaint for a quarter of a century.
 

 Six years is a .statute bar to an action of account, both at law and in equity. Has the complainant stated in his bill, and sustained by proof, such a case as would justify the interference of a court of equity after so'great a lapse of time?
 

 1. Has he discovered any thing which was not as -open to discovery by himself or his predecessor in the administration, more than twenty years before ?
 

 2. Has he shown any fraud, misrepresentation, or concealment, practised by the defendant on Sarah Page, arid
 
 “
 
 made it palpable to the court,” so that it would be justified in directing the1 whole account to be opened and taken
 
 de. novo
 
 ?
 

 3. Or has such clear mistake or omission been shown with regard to any. of the items of the account, that the court would grant liberty to the complainant to surcharge and falsify generally, or as to any particular item ?
 

 ■ In order to repel . the imputation of laches, the complainant states that he did not take out- letters of administration
 
 de bonis non
 
 on the estate of John O. Page till the year 1834, eight years, after the death of Sarah Page, the administratrix, and. six years after his marriage with one of the heirs; “ that, on examining the papers and accounts, he discovered that there was a considerable amount of property of said estate included in the inventory which had not been administered by said Sarah in her lifetime; that, in pursuing the inquiry, he gradually obtained information by various means, afforded, in the first place,, by the state of those papers, and from sundry- other sources .and conversations with persons now living or deceased, which produced the persuasion and firm belief, that -there was much of. said property in the hands, and possession" of Rufus K. Page which has not been exhibited or accounted for by him,” &c.
 
 *831
 
 “ but that how far the said Sarah Page was in the knowledge and possession of all the information in respect to the premises, that has come to his knowledge, he is not able to say, on account of her death before he had any reason or opportunity to ascertain the same.” It appears, therefore, that the complainant has discovered no fact of which Sarah Page was ignorant. He can specify no misrepresentation, concealment, or fraud,. practised by defendant, which has for the first time come ,to light. He does not state what property was not accounted for by Sarah Page, or how she was deceived or defrauded by Rufus.. In fact, taking the various bills and ámendments together, it' is very plain that this bill was filed on suspicion of fraud, and for the purpose of a discovery of facts from the defendant on which to found specific, charges of fraud. It is. clear, also, that these suspicions had their origin, not on the discovery of any new facts concealed from his predecessor in the administration, but from his necessary ignorance of facts of which Sarah Page and her counsel must have been fully conversánt, from the very nature and circumstances of the case.
 

 When this bill is divested of its general and vague charges of fraud in matters óf which the complainant could have no personal knowledge, it might well be doubted whether it contains sufficient matter properly set forth to entitle the complainant to call on the defendant, after so great a length of time, to answer to its allegations and make a. discovery with regard to facts so likely to be forgotten or indistinctly remembered.
 

 But,, waiving this point, let us examine the' specifications of fraud or mistake which some attempts have been made, to substantiate.
 

 1. The complaint about the ship Horatio being found untenable is left out of the amended bill, and need not be*noticed. .
 

 . 2. The bill denied that any pártnership had existed between Rufus and John O. Page; but, after taking testimony to contradict the answer in this respect, an amendment, filed in 1841, admits the partnership, but charges that the terms were different from those stated in the answer. On this point, the answer, being responsive to the bill, must be taken to be true unless disproved by two witnesses, or something equivalent. The memorandum in the handwriting of John Q. Page, ’ not being signed by Rufus or himself, and never corhmUnicated to Rufus or assented to by him, cannot be received .as evidence of ihe fact.
 

 3. The notes of Rufus to . John for $10,000, if given, as stated in the answer, to show, the amount of capital advanced to the store by John, áre fully and properly accounted for.
 
 *832
 
 The referees who stated these accounts had the partnership books and the parties before them, and could best júdgé how the capital account had been kept, whether by credits in the books or giving the notes of the . firm, which would be. the notes of Rufus
 
 K.
 
 Page. The parties acquainted with the transaction had no difficulty about it, and the mere suggestion of a-stranger to the whole transaction, now made', some thirty years afterwards, that possibly these'notes were t-he private debt of Rufus,' and not given to represent the capital of the store, cannot be received as evidence of mistake or fraud. The answer being responsive to the bill, and uncontradicted by «ne evidence, is conclusive of the fact. The accounts show that Rufus accounted with the administratrix .for the goods of the store inventoried on the decease of John 0. Page, for the capital of the firm,.amounting to over $10,000, and for John’s share of the profits, exceeding $ 12,000. The complainant has wholly failed to show any mistake, omission, fraud, concealment, or misrepresentation, on the part of Rufus K. Page, in connection with the subject.
 

 4. The interest of John O. Page in -the brig Emmeline was transferred by Sarah Page, the administratrix, to Rufus, and the amount accounted for by her in the inventory and administration accounts settled by her. Whether the money was paid to her by Rufus, as he asserts in his answer, or she made' a gift of it to him ‘ on account of the known intention of her •husband to give it to him by his will, is wholly immaterial in this base, as .the administrator
 
 de bonis non
 
 can have no concern with property administered and accounted for by his predecessor iñ the trust.
 

 In the course of the argument, the learned counsel noticed other items of account, which they alleged to be erroneously stated or. not sufficiently explained;, but' as they were not •charged in the bill, they will not be noticed.
 

 . The decree of the Circuit Court must therefore be affirmed, with costs..
 

 Order.
 

 This cause, came on to be heard on the transcript of the record from- the Circuit Court of the United. States for the District of Maine, and was argued by counsel.' Oh consideration whereof, it is now here ordered and decreed by this court, that the decree of the said Circuit Court in this cause-' be,’. and the same is hereby, affirmed, with costs..