## HALSEY et al. v. CHENEY.

### (Circuit Court of Appeals, Seventh Circuit. July 9, 1895.)

### No. 168.

PRINCIPAL AND AGENT—TRUSTS—LACHES.

The executors of one D. filed a bill for an accounting against C., alleging that he had obtained control of the affairs of D., an inexperienced woman, and had misappropriated her property, and failed to account. C. denied the charges, and, on the hearing, there was a failure to prove that D. was under C.'s control; and it appeared that while she had had full opportunity for 10 years, while free from C.'s influence, to object to his management, she had never done so, and that C. held vouchers for his most important transactions. *Held*, that any right to relief which D. or her executors might have had was barred by laches.

Appeal from the Circuit Court of the United States for the Southern District of Illinois.

This was a suit for an accounting by Edmund D. Halsey and Ann Caroline Teese, executors of Mary D'Arcy, deceased, against Prentiss D. Cheney. The circuit court dismissed the bill. Complainants appeal.

Samuel P. Wheeler and Charles H. Aldrich, for appellants.

John G. Drennan, for appellee.

Before WOODS and JENKINS, Circuit Judges, and BAKER, District Judge.

WOODS, Circuit Judge. Dr. Edward A. D'Arcy, a resident of Jerseyville, Jersey county, Ill., died April 25, 1863, possessed of a large estate, which he devised equally to his surviving wife, Mary D'Arcy, who was made executrix of his will, and two daughters, Ann Caroline Teese, one of the appellants, and Catherine Cheney, wife of the appellee, Prentiss D. Cheney, except that the homestead and a tract of land, worth together about $5,000, were given to Mrs. Cheney, because the testator anticipated that Mrs. Teese would benefit by inheritance or bequests from relatives in the East with whom she had lived from infancy. From the death of her husband until after the death of Mrs. Cheney, in 1877, Mrs. D'Arcy was a member of the family of the appellee. She then removed to New Jersey, where, until her death, which occurred August 12, 1887, she lived with her sister Matilda Fairchild, during the winters at Morristown, and in the summers at Mendham; the residence of Mrs. Teese being at Newark. The appellants, Edmund D. Halsey and Mrs. Teese, were named as executors of the will of Mrs. D'Arcy, and, having received letters testamentary, on the 17th of February, 1888, instituted this suit against the appellee, charging and alleging, besides the facts stated and other formal matters: That the estate of Edward A. D'Arcy consisted of both real and personal property; that the devisees, by divers quitclaim deeds, made an amicable partition of the portions of the real estate devised to them in common, and the residue, excepting lands in Missouri which they continued to hold in common, they proceeded to sell, and to divide the proceeds; that Mrs. D'Arcy at the death of her husband was

advanced in years, unaccustomed to business, and ignorant of her duties as executrix; that Cheney was a plausible man, of good character, and of winning address and manners, and by means thereof obtained her confidence, and induced her to commit to him the care and custody of her estate; that he assumed the active management of the estate of Edward A. D'Arcy, acting therein as the agent, attorney, and trustee of the executrix, and personally received into his hands the entire proceeds of the estate, but that the particulars of his service cannot be stated, because the papers relating to the estate are not on file in the office of the county clerk, and, according to the statement of the clerk, had been removed; that the interest of Mary D'Arcy in the estate and the amount received by Cheney as and for her share was a large sum, to wit, $20,000; that, in the year 1871, Mrs. D'Arcy received from the estate of her brother, Alexander McEowen, notes, bonds, and money to the amount of $10,000, which, together with the proceeds of the estate of her husband belonging to her, were, from time to time as they came to her, received by Cheney, upon his undertaking and agreement to act as her trustee in loaning the same, and were by him loaned, whereby her estate was largely increased; that, by reason of his influence over her, Cheney was able to postpone any full accounting with Mrs. D'Arcy, although he did long prior to her death render partial accounts, "which your orators now have," but which do not bring the account to the time of her death; that he retained the whole of said money in his hands as trustee, excepting small payments made as stated in the bill; that he never rendered to her a full and fair account of said trust, or of the income and profits, nor to the complainants, as executors, since her death, although requested in a friendly way to do so, but, on the contrary, refused to give to complainants any information on the subject; that in 1877, when Mrs. D'Arcy went to reside in New Jersey, there was in Cheney's hands, held in trust for her, of principal and accumulations, the sum of $25,000, of which he paid her occasional small sums, aggregating not more than $500; that, at sundry times after the death of her husband, Mrs. D'Arcy became seised of divers lots, lands, and real estate in Illinois and elsewhere, and that, while holding towards her the confidential relation of trustee, and availing himself of the influence he had over her, Cheney, for the purpose of his own gain, and without adequate consideration, procured from her, either to himself or to others for his benefit, deeds of conveyance for every square foot of real estate she owned; that this was systematically carried on for years, your orators charge, fraudulently, and Cheney should in equity establish the fairness of the several transactions; that Cheney sold timber from lands in Missouri, and received therefor $8,000, of which he never accounted to Mrs. Cheney for her share; that by reason of frequent changes of investment made by Cheney, sometimes taking securities in his own name, and intermingling the moneys of Mrs. D'Arcy with his own, an intelligent account cannot be stated, except by Cheney; that, disregarding his duty as trustee, he has refused to make any statement whatever. The bill prays that Cheney be

made party, and required to answer, but not under oath; that, on the hearing, an account may be taken of his doings in connection with Mrs. D'Arcy's estate; that an account may be stated, under the direction of the court, of all moneys received by the defendant or properly chargeable to him on account of the trust; that the complainants may have a decree against him for the balance due them as executors, also a decree that the several conveyances of Mrs. D'Arcy to the defendant or to others in his interest were fraudulent; that the defendant be required to show that the transactions were in good faith; and that, in all cases where the consideration was not adequate, the defendant be decreed to hold the estate in trust, if he has not parted with the title; and, if he has parted with the title, that he may be charged with the value and compound interest.

The defendant answered, denying many of the essential averments of the bill; particularly that he had been the agent, attorney, or trustee of Mrs. D'Arcy, as executrix, in respect to the management of the D'Arcy estate; that the property or proceeds thereof had come into his hands; that he had been her agent, attorney, or trustee in respect to her individual property derived from that estate, or from the estate of her brother, or that her property or money had come into his hands upon his agreement to act as trustee in loaning the same; and alleging that all his acts and doings for her had been done by him as her son-in-law, in order to conserve her interests, and without compensation, and that he had made to her full and fair accounts and statements, to her satisfaction, and paid over to her what was due.

Issue having been joined by a replication in denial, a reference was made to a special master to take an account, "and, for the better discovery of the matters aforesaid," it was ordered that the defendant within 30 days submit to the master a full, true, and accurate account, with dates and amounts, etc., and that the master examine witnesses, and embody the testimony in his report. In obedience to that order, the defendant, on March 18, 1891, made to the master a statement, showing, that on February 5, 1866, Mrs. D'Arcy had with D'Arcy & Cheney, bankers, of which firm the defendant was a member, the sum of $1,040.89; that on April 25, 1872, there were in his hands, belonging to her, promissory notes, which are described, amounting, principal and interest, to $14,-666.66; that on April 21, 1874, a settlement was made with her which left in his hands specified notes to the amount of $5,066.66, for which, in a settlement made September 9, 1879, she was allowed a credit on her note then held by him, given for Nebraska lands, as shown by a written assignment of which a copy is set out. This the defendant presented as a full, true, and accurate account to date so far as it was in his power to state the same, alleging that he had no record or account of any other transaction, and that, if there were others, they were unknown to him. Upon this, the master, on January 24, 1891, made to the court a report of his efforts and inability to obtain a more satisfactory accounting; and on July 18, 1891, upon the petition of the complainants, the court ordered the defendant, by the ensuing 1st (afterwards changed to

the 23d) of September, to show cause why he should not be attached for contempt of court. On the last-named day, the defendant filed his answer to the rule to show cause, and at the same time presented to the special master an additional and supplementary account, wherein it is stated that the firm of D'Arcy & Cheney consisted of himself and Mrs. D'Arcy, the interest of the latter being nominal only; that on January 1, 1866, the business was sold to Cross & Swallow, and her deposit of $1,040.89 paid to her February 5, 1866, as shown by Exhibit C; that, after the banking business was closed, he kept no account with her; that she kept a book in which was an account of her notes and money affairs, which book was taken by her in 1877 to New Jersey, and was never under his control; that while she lived with him she kept her valuable papers in his fireproof safe, to which she had access at her pleasure, this practice continuing until April 25, 1872, when he gave her a receipt (Exhibit E) for her papers; that no account was kept or made of collections except by her in her own book, she receiving the money; that on January 4, 1873, he sold and conveyed to her lands in Nebraska, in Johnson county for $7,200, in Pawnee county for $6,600, and in Lancaster county for $2,000, in payment for which she delivered to him, April 25, 1871, notes amounting to $5,800, and for the remainder of the price ($10,000) gave him her promissory note, drawing six per cent. interest, which he held until May 9, 1885, when, upon a settlement made, she gave him in lieu her note for $5,600, payable five years after date, with six per cent. interest, which note he had transferred to A. W. Goss, of the First National Bank of Jerseyville, who is now the holder thereof; that on April 21, 1874, a settlement was made between them, at which time there were in his hands (in his safe in an envelope marked "Mary D'Arcy") the notes set forth in Exhibit F; that the Samuel Doud note ($400) and Silas Bates note ($666.66) were paid to her; that he had no memorandum of dates and amounts; that the claims against Joel Cory ($3,000) and W. A. Potts ($1,000) were paid, and the proceeds invested in Nebraska loans; that, having been compelled to bring suits for foreclosure, she transferred her Nebraska claims to him upon his agreement to credit upon her note the amounts received; that in the settlement of May 9, 1885, the credit was allowed upon the $10,000 note, leaving her indebted thereon in the sum of $5,600, for which she then gave the note above mentioned; that in that settlement he accounted to her for $600 received for timber from lands in Missouri, for which she gave the receipt marked "Exhibit G" filed with the master. Thereupon the court ordered that the rule to show cause be discharged and that the special master be relieved from further duty, it appearing that an account could not be stated from the data furnished, and that all matters involved in the suit be brought before the court without the intervention of a master's report. Upon the final hearing the bill was dismissed for want of equity.

The bill, it is to be observed, is one for relief, and not for discovery. Though it alleges that in certain particulars an intelligent account cannot be stated except by the respondent, it submits no

interrogatories, asks no discovery, waives verification of the answer, and prays that an account may be stated under the direction of the court. The case comes, therefore, within the general rule that every fact essential to the plaintiff's title to maintain the bill and obtain the relief must be stated in the bill, and that relief will not be granted "for matters not charged, although they may be apparent from other parts of the pleadings and evidence." Story, Eq. Pl. § 257; 1 Daniell, Ch. Pl. & Prac. 325, 326; Stearns v. Page, 7 How. 819, 829.

The evidence in the record is voluminous, but we deem it necessary to notice only some of the more salient features, in connection with the allegations of the bill to which they are pertinent. The evidence does not support the averment to the effect that, by reason of advanced years, inexperience in business, and ignorance of her duties as executrix, Mrs. D'Arcy came under the domination of Cheney, and was induced by him to commit her estate to his custody and management. On the contrary, it is apparent that she was a woman of more than the average intelligence, accustomed to think for herself, and to give attention to her own affairs. Besides, it is shown that for some months after the death of her husband, and until a division had been made of the estate, she had the assistance and advice of F. M. Teese, a lawyer of large experience, and the husband of her daughter Caroline, whose interest in the estate was equal to her own. At the same time it is evident that Mrs. D'Arcy reposed confidence in Cheney, and, while she lived with him, received his assistance in the management of her affairs; but upon the death of Mrs. Cheney, in 1877, she went to live with her people in New Jersey, and if in the transactions in Nebraska lands, or in other respects, she had been wronged by Cheney, it is not probable that she would or could have concealed the fact from her daughter, with whom and with whose husband she was on friendly terms; and if the fact of such wrongs as are charged became known to Mr. and Mrs. Teese, it is both incredible and inexcusable that suit was not brought during Mrs. D'Arcy's life, when she and Cheney would both have been competent to testify, instead of waiting 10 years, and until after her death, before suing, and then insisting, under a disqualifying statute, which might have been waived, that the one witness who, it is conceded, could give "an intelligent account," should not be heard. The bill admits that, long prior to Mrs. D'Arcy's death, Cheney rendered to her partial accounts, which, though in the possession of the complainants, are not set out. It is alleged that they are not fair and full, and do not bring the account to the time of her death. Rendered to her, they, of course, did not come to the time of her death, but it should have been alleged to what time they did come, what they contained, and in what respect they were false or erroneous. There are vouchers in evidence, attested by the signature of Mrs. D'Arcy, which cover the most important, if not all, of the matters in dispute; but the body of the instruments in each instance is in the handwriting of Mr. Cheney, and might have been written after the signature was obtained, and on that account it is insisted they should be

rejected. On the contrary, the genuineness of the signatures being undisputed, the documents constitute at least prima facie evidence of the settlements which they recite, and the burden was on the complainants to overthrow or discredit them. We do not overlook the circumstances in evidence which unexplained throw grave doubt upon some of the transactions for which we are asked to declare the respondent accountable; but they are not of a character which makes explanation impossible, and in view of the lapse of time, the long acquiescence of Mrs. D'Arcy, and of the fact that Cheney was not required nor permitted to give such explanation as he could, we are unable to see any safe ground upon which we can set aside the decree rendered, and award relief to the complainants. They have no better standing in court than would Mrs. D'Arcy have if she were living and the suit had been in her name, and without different proof from what has been made, if the suit were by her, we should be of opinion that her delay in bringing it was inexcusable and fatal to her standing in a court of equity. There is some proof, amounting to a degree of probability, that Mrs. D'Arcy understood and intended the disposition which was made of her property. It may be that in each instance Cheney was dealing with affairs in trust, but, if that be conceded, it results only that the transactions were voidable, and not void; and, after long acquiescence by the party interested, the courts should not interfere, unless upon a reasonable certainty that they would not be committing an injustice equal to or greater than that supposed to need correction. Stearns v. Page, supra; Hammond v. Hopkins, 143 U. S. 224, 12 Sup. Ct. 418.

A pertinent discussion of the effect of laches upon the right to relief in equity is found in the recent case of Abraham v. Ordway, 15 Sup. Ct. 894, from which we quote the following:

"It is now too late to ask assistance from a court of equity. The relief sought cannot be given consistently with the principles of justice, or without encouraging such delay in the assertion of rights as ought not to be tolerated by courts of equity. Whether equity will interfere in cases of this character must depend upon the special circumstances of each case. Sometimes the courts act in obedience to statutes of limitations; sometimes in analogy to them. But it is now well settled that, independently of any limitation prescribed for the guidance of courts of law, equity may, in the exercise of its own inherent powers, refuse relief where it is sought after undue and unexplained delay, and when injustice would be done, in the particular case, by granting the relief asked. It will in such cases decline to extricate the plaintiff from the position in which he has inexcusably placed himself, and leave him to such remedies as he may have in a court of law. Wagner v. Baird, 7 How. 234, 238; Harwood v. Railroad Co., 17 Wall. 78, 81; Sullivan v. Railroad Co., 94 U. S. 806, 811; Brown v. Buena Vista Co., 95 U. S. 157, 159; Hayward v. Bank, 96 U. S. 611, 617; Lansdale v. Smith, 106 U. S. 391, 392, 1 Sup. Ct. 350; Speidel v. Henrici, 120 U. S. 377, 387, 7 Sup. Ct. 610; Richards v. Mackall, 124 U. S. 183, 188, 8 Sup. Ct. 437."

The decree of the circuit court is affirmed.