## UNITED STATES v. BIGHORN SHEEP CO. et al.

(District Court, D. Wyoming. November 2, 1925.)

No. 884.

1. **Public lands ⊚⇒139—Agreement to purchase claim after entryman has proved up held not fraudulent.**

Agreement to purchase homestead claim after entryman has proved up, in case he desires to sell, or agreement to purchase timber and stone claim after initial application and before final proof, is not fraudulent.

2. **Public lands ⊚⇒120—Evidence held insufficient to show that sheep company procured fraudulent entries by persons from whom it had subsequently purchased lands.**

In suit to cancel patents to public lands, evidence *held* insufficient to show that defendant sheep company procured fraudulent entries by persons from whom it subsequently purchased lands.

3. **United States ⊚⇒124—Rules of law governing equity suits by private litigants apply to United States.**

United States, in equity suit, is subject to same rules of evidence, proof, and presumptions of law and fact as is a private litigant.

4. **Contracts ⊚⇒99(3)—To annul written instrument, fraud or mistake must be clear, unequivocal, and convincing.**

To annul or set aside written instrument for fraud, or mistake, testimony to support charge must be clear, unequivocal, and convincing.

5. **Evidence ⊚⇒135(1)—Testimony as to other fraudulent entries held not admissible in suit to cancel patents for fraud.**

In suit to cancel patents to public lands fraudulently procured, testimony as to entries

not included in bill, or as to entries dismissed from amended bill, were inadmissible to show fraudulent intent; charge of fraud implying intent.

**6. Evidence ⟨key⟩113(1)—Proximity of stone and timber claim to market not considered on issue of its value.**

In action to cancel stone and timber patents as fraudulently procured, proximity to market of claim, valuable for stone, will not be considered on issue of its value.

**7. Limitation of actions ⟨key⟩195(5)—Running of statute not suspended, where proofs failed to establish time when government discovered fraud in entry.**

Where proofs failed to sustain government's allegations in action to cancel patents for fraud as to time of discovering fraud, running of statute (Act March 3, 1891, § 8 [Comp. St. § 5114]) was not suspended.

**8. Public lands ⟨key⟩120—Evidence held insufficient to show fraudulent conspiracy to create isolated tracts by procuring other classes of entries.**

Evidence *held* insufficient to show fraudulent conspiracy to create isolated tracts by procuring other classes of entries.

**9. Public lands ⟨key⟩120—That commissioners, who took proof as to isolated tracts, were in defendant's employ and turned over fees, held not badge of fraud.**

That commissioners, who took proof in connection with entries of isolated tracts, were in employ of defendant sheep company, which subsequently acquired such lands, and that fees earned by them were turned in to defendant company, *held* not badge of fraud, requiring cancellation of patents, where commissioners were paid stated monthly salaries covering their entire time.

In Equity. Suit by the United States against the Bighorn Sheep Company and others. Bill dismissed.

Albert D. Walton, U. S. Atty., and Clyde M. Watts, Asst. U. S. Atty., both of Cheyenne, Wyo.

George E. Tralles, of Denver, Colo., for defendants.

KENNEDY, District Judge. This is a suit in equity seeking to cancel certain patents to public lands, the title to which has found its way to the principal defendant, Bighorn Sheep Company, upon the ground that title to the lands was secured through conspiracy and fraud on the part of the defendants, and the matter is now before the court upon final hearing.

The suit was instituted more than nine years ago, and has been before this court in different phases, with three different judges presiding. It was also once before the Circuit Court of Appeals for the review of an order dismissing the cause as to certain en-

tries contained in the bill, but, the order having been held not to be in the nature of a final judgment, the appeal was dismissed. U. S. v. Bighorn Sheep Co. et al., 276 F. 710. The evidence in the case was taken before a special master without power to determine the issues in the case. The counsel on both sides of the case have been changed since the evidence was taken. The testimony discloses that a lapse, in some instances of 14 years, had taken place between the date of the facts being testified to and the date when the testimony of the witness was being taken, so that much of the testimony seems to be clouded with the lack of memory on the part of witnesses. Such a combination of circumstances, with evidence scattered through 12 large volumes of typewritten testimony and exhibits, makes it unusually difficult for a trial court to arrive at a conclusion in the case.

Fortunately a considerable number of the entries challenged have been eliminated from the consideration of this court by the action of my predecessor, the late John A. Riner, who dismissed those entries out of the bill of complaint upon its face, and as to this portion of the case I have made no examination or study, but accept it as a phase of the case already disposed of. Counsel for the plaintiff, in their trial brief, at pages 6 and 7, have further reduced the court's duties through an analysis of the several entries remaining, which are to be determined by this court substantially as follows: Original entries involved, 98; dismissed by Judge Riner, 34; entries shown by evidence to be within the ruling of Judge Riner, 7; and entries where there is no evidence to support them, 1—making a total of 42 entries which are abandoned upon this hearing, and leaving a balance of 56 entries which the court is asked to consider.

The lands to which the bill of complaint is addressed are divided into four different classes, represented by entries upon the public domain, as follows: Homestead entries, desert land entries, timber and stone entries, and isolated tracts. And the 56 entries remaining for consideration are divided as follows: 1 homestead, 1 desert, 19 timber and stone, and 35 isolated tracts. The cause is being tried upon the amended bill of complaint, filed March 11, 1918, and the answers of the several defendants thereto. Of these defendants, the Bighorn Sheep Company, John B. Okie, and Clarice V. Okie have answered the bill on its merits, with admissions and denials, which places in issue all the allegations of the bill with reference to con-

spiracy and fraud. The defendant Day alleges a disclaimer. The defendants First National Bank, August Paul, and Mary E. Pitcher were mortgagees, who deny any knowledge of fraud on the part of the principal defendant or the officers thereof.

Briefly, the bill of complaint charges that the Bighorn Sheep Company, through its duly authorized officers, employés, and representatives, devised a scheme to defraud the plaintiff of the title, use, possession, and control of a large quantity of its valuable lands in the state of Wyoming for the benefit of the Bighorn Sheep Company, by conspiring to procure and hire entrymen to enter, purchase, and make proofs of title to those lands under the Homestead, Desert, Timber and Stone, and Isolated Tract Acts of the United States. One of the elements of the fraud entering into the matter of the procurement of the isolated tracts is the allegation that they were not in fact isolated tracts, but that in pursuance of the conspiracy they were attempted to be made such by the unlawful procurement of entrymen under other forms of entry, so that they would apparently be constituted as isolated tracts and then purchased. There are allegations which set forth concealment on the part of the defendants of their unlawful acts, so that it was impossible for the plaintiff to be advised of them. The bill also carries an allegation that the plaintiff's first knowledge of any irregular or fraudulent conduct on the part of the defendants in the premises was a letter from one Moe to the Interior Department in December, 1910, which advised the government of some irregularities in connection with desert entries of the defendant John B. Okie. It would be impracticable, and unduly extend this memorandum, to try and set forth the allegations of the bill in greater detail.

[1, 2] Before considering the legal propositions involved, I have thought it advisable to consider individually the entries which are challenged, with perhaps the exception of the isolated tracts.

The first entry presented for the consideration of the court is the homestead entry of Harry Bryant, which is the only one of its class remaining in the case. An examination of the testimony discloses that the agreement, if any, as to the purchase of this claim by the defendants, or any of them, was after the entry had been made, and just prior to final proof, and it appears that the agreement was that, if the entryman proved up, the defendant Okie would purchase the claim from him. In fact, the entryman testifies that he went himself to Okie to see if he would not make the purchase. Furthermore, the entryman testified that Mr. Okie had nothing whatever to do with his taking up the entry. No other specific proof is suggested by counsel to substantiate the charge of conspiracy or fraud in connection with this entry, and I have been able to find none in the evidence. The agreement on the part of Okie to purchase the claim after the entryman had proved up, in case he desired to sell it, is not fraudulent. United States v. Richards (D. C.) 149 F. 443. The bill, therefore, as to this entry cannot be sustained.

The next entry is that of a desert land entry by Ruth A. Norton, as to which counsel for plaintiff state in their brief: "There is no evidence as to this entry, except the evidence given by E. O. Fuller as to its value." Certainly such an entry needs no further consideration than to rule that the complaint shall be dismissed as to it.

The timber and stone entries, of which there are 19 remaining, may for consideration here be divided into three classes, constituting groups of 4, 10, and 5, being so divided on account of the evidence offered to support them.

The group of 4 comprise entries concerning which it seems to be conceded in the trial brief of counsel for plaintiff that there is no evidence to sustain the charges in regard to them. These entries are those of Andrew J. Crosley, William A. Brown, Harry O. Cox, and Patrick E. Conley, concerning which counsel for plaintiff say in their brief, substantially, that there is no testimony as to the making of the entry, and that all evidence has to do with the character of the land and its value. These must accordingly be dismissed out of the bill.

The group of 10 seems to fall within a class which is different than the 4 immediately preceding, in that there is some evidence offered tending to support the charge of fraud, and they will now be considered.

The first of these is the entry of Elizabeth L. Livingston. In regard to this entry, which was subsequently sold to the principal defendant, the evidence tends to show that the entryman made the first move toward taking up the claim, in that she states that she asked the defendant Okie regarding land that could be taken up, and, while in addition she testified she only received $25 for the claim when she sold it, that the consideration mentioned in the deeds of $465 might have been placed in her account with the store of the Bighorn Sheep Company, and that she received it in that way. No other testimony is

offered, which has been called to the court's attention, of a nature which would tend to show any fraudulent act of any of the defendants in procuring the entry of this land, and it must therefore be dismissed out of the bill.

The next entry is that of one Pearl Crosley. In regard to this claim, the entryman's testimony tends to show an exceedingly hazy memory. She does testify, however, that she took it up because she wanted it for a cow camp, but that it had stone on it. The witness did not remember what she received, if anything, for making the deed, and that, the entry having been made 14 years before, she had no clear recollection in regard to the matter. The evidence, therefore, is not sufficient to sustain the charge in the bill.

The next entry is that of Kate Stoddard, under the Timber and Stone Act (Comp. St. §§ 4671–4673, 4988, 10216). She testifies that she had no recollection of any one speaking to her concerning the making of this entry, but she does say that Mr. Okie, the defendant, took her out to view the entry. In regard to the subsequent sale of this entry to the defendant, she testifies, in response to a question as to whether or not she expected Mr. Okie to get the entry, that she expected to give him a chance to get it. As there is no further corroborative evidence of fraud, it must be held that the charge as to this entry as well has not been sustained, and must be dismissed.

The next entry is that of Martha A. Edgerton. The memory of this witness is also exceedingly hazy. She did not remember whether she was acquainted with the land at the time of filing, but states that she filed at her husband's request, and that she believes $25 was received out of it, which was paid to the family, and that she supposed it was paid by Mr. Okie. She does not remember who selected the land. She testifies on cross-examination that her answers made at the time she signed the papers for entry were probably more likely to be the truth than what she testified to in the deposition. In the absence of any further corroborative proof of fraud charges against the defendants, it is difficult to reconcile this testimony as sufficient to sustain the charge, and it must be dismissed.

In the case of Stanley Overbaugh, the memory of the witness seems to have failed almost entirely. He barely remembers taking up the land, was confused as to the location of it, but thought it was subsequently sold to the defendant, of which transaction the witness also has no distinct recollection.

If there were corroborative proof which might indicate any activity of the defendant in securing the entry, it would put this claim in the doubtful class; but there seems to be no further evidence tending to sustain the fraud, but, on the other hand, any inference of fraud in connection with the claim is affirmatively refuted by defendant's testimony.

The entry of Perry A. Morris is in a similar class as that of Overbaugh. The memory of the witness was exceedingly poor, although the defendant testified that he believed he took it up for use in the stock business, and the only evidence tending to substantiate fraud is that it was subsequently sold to the defendant.

As to the entry of Willard M. Doubleday, it seems from the testimony of the entryman that the claim had previously been filed upon by the entryman's wife as a desert entry, but that it was relinquished and then filed upon by the claimant under the Timber and Stone Act; that while the land was valuable for the stone which was upon it, out of which the entryman built three dams, for which he employed a man covering a period of three weeks, to constitute reservoirs for the purpose of watering sheep, he did not primarily want the land for the stone, but for a water camp for his sheep; that Mr. Okie helped him to make out his papers, as he was the local advisor on all land matters in that vicinity, but that the defendant Okie had had nothing to do with his taking up the land; that all conversation in regard to the sale with the defendant Okie was after the entryman had proved up, which he thinks was some five years after securing the patent; and that it was then sold to the defendant at $10 per acre. Certainly the evidence as to this entry not only fails to show fraud, but affirmatively shows the absence of it.

In regard to the entry of James T. Brown, the memory of the entryman was defective, in that he did not remember of signing certain papers involved in the entry, but does state that he was induced to file on the claim by Mr. Okie and one Brown. It appears that the Brown spoken of was his brother, who was engaged in the sheep business in the vicinity, and used the land in controversy in that business. He does not remember of paying any money in making the entry or proving up, but says that, so far as he knows, it was paid by Mr. Okie. The only positive testimony as to his connection with the defendant Okie is that he went to see him once, and he was asked by the defendant if he was going to leave before he took up

the claim. This was presumably the claim that he had previously filed upon, as the witness was then about to leave the country. There is, of course, ground for suspicion in this claim, but no direct evidence, except the conversation in which the defendant Okie had asked the claimant if he was going to take up the claim, coupled with the circumstance that it was afterwards purchased by the defendant, which would tend to establish fraud. In my opinion, the evidence ought not to be held to be sufficient to cancel the patent.

The entry of James B. White upon examination discloses a still different situation. While the entryman testifies upon the hearing in this case that Mr. Okie told him about the land, yet he testifies that he took it up because he planned on going into the sheep business, and also figured that the timber and stone on it might be of value; that he paid the filing fees himself, and that, when he decided not to go into the sheep business, because his wife did not care to live in the West, he sold the land to the Bighorn Sheep Company at about the time he made final proof. He does not remember, however, what was paid him for the purchase by the sheep company. There seems to be no further proof of fraud which may be imputed to the defendants in the case, except the mere circumstance of its being purchased subsequently by the principal defendant, and this likewise cannot be held to be sufficient proof of fraud to sustain the charge.

As to the entry of William F. Griffith, he testifies that he was in partnership with Mr. Okie in the sheep business, and that he took up the land, expecting to swap it to Mr. Okie for some other land on the range, and that the expenses for entering the land were subsequently paid by him in his settlement for the sale of the land. I think that this entry comes within the class which fails on account of lack of sufficient evidence.

Some of these entries could, under the proofs, be disposed of upon the following legal principle: An agreement to purchase a timber and stone claim, after the initial application and before final proof, is not a violation of law. United States v. Biggs, 211 U. S. 507, 29 S. Ct. 181, 53 L. Ed. 305; United States v. Barber Lumber Co. (C. C.) 172 F. 948, affirmed 194 F. 24, 114 C. C. A. 44.

[3-5] In view of the consideration and conclusion as to these 10 entries, and the insufficiency of the evidence to support the

charge of fraud in relation to them, the matter of the character of the land is not material. It must also be remembered that the government in an equity suit is subjected to the same rules of evidence, the same character of proof, and the same presumptions of law and fact as is a private litigant. United States v. Stinson, 197 U. S. 200, 25 S. Ct. 426, 49 L. Ed. 724; Hemmer v. United States, 204 F. 898, 123 C. C. A. 194; Central Trust Co. v. Treat (C. C.) 192 F. 942. And, in addition, the rule of law is that, to annul or set aside a written instrument for fraud or mistake, the testimony to support such a charge must be clear, unequivocal, and convincing. United States v. Maxwell Land-Grant, 121 U. S. 325, 7 S. Ct. 1015, 30 L. Ed. 949. Neither can the testimony as to other entries not included in the amended bill of complaint, or as to other entries dismissed from the amended bill, be admitted for the purpose of bolstering up the charge of fraud in those entries which are under consideration. The use of this class of evidence is admissible as an exception to the general rule for the purpose of proving intent, but in a case where fraud is itself charged the charge implies intent. This distinction, as to when the evidence of similar transactions which are outside the general rule may be admitted in evidence, is very clearly defined in the case of Marshall v. United States, 197 F. 511, where at page 515, 117 C. C. A. 65, 69, the opinion of the court reads:

"The question here was whether the defendant had devised a scheme to defraud and had used the United States mails in furtherance thereof. In order to prove guilty intent, the government introduced testimony showing defendant's connection with another similar scheme. The admission of such testimony is an exception to the general rule. It is allowed, where a guilty intent must be shown, to meet the presumption of accident or mistake. Such is the case of passing counterfeit money, or of filing undervaluing invoices 'with intent to evade' the customs law, or of making false representations 'with intent' to obtain property thereby. When the government has proved that the defendant has passed a counterfeit coin, or has filed an undervaluing invoice, or has made false representations, the case is not fully made out. Every one of these things might be done innocently in one instance, but hardly in many instances. The exception ought not to be extended. Such testimony certainly prejudices the defendant, even if the court

charges the jury that it is admitted only to show intent. It is not needed in the case of a scheme to defraud. It would be impossible to find the existence of a scheme to defraud, without finding also the fraudulent intent of the person who devised it. The moment the fraudulent scheme is established, there is no necessity for resorting to other transactions, as in the excepted cases mentioned. No one can have an innocent intent in devising a fraudulent scheme."

The remaining 5 timber and stone entries will now be considered. The first is that of Frank B. Edgerton. This entryman, as a witness before the master, testifies directly and positively that he was a foreman for Mr. Okie, one of the defendants, and that this defendant told him that he would pay him $25 to take up a timber and stone entry; that he did take up such entry, and that the defendant Okie selected the land and gave him the numbers thereof. The witness does not remember the details of making out the papers, and does not remember how the money was paid to him for making the entry. He further testifies that he did not know whether it had timber or stone upon it, or water upon it, but his recollection is that the land was not very valuable for any purpose.

The next entry is that of Benigno Martinez. This entryman, as a witness, testifies that he was a sheep herder for the Bighorn Sheep Company, and that at one time he and another man ran sheep of that company on shares; that at another time he worked for one Griffin, who was also running sheep for the defendant Okie on shares. He testifies that he made a timber and stone entry on being importuned to do so by Griffin, who said he was acting in behalf of the defendant Okie, but does not remember who made out the papers, although they were fixed up in the office of the United States commissioner, which was in connection with the Bighorn Sheep Company's office at Lost Cabin; that he was paid $30 for the land by Mr. Griffin, who said that he was paying him for the land the witness took up for Mr. Okie. It does not appear, however, that the witness ever had any conversation with the defendant Okie about the land. Griffin, when called as a witness, denied having the conversations testified to by Martinez, even if the testimony as to what Griffin said would be considered as admissible as against defendants.

The next entry for consideration is that of Albert E. Faull. This entryman testifies, as a witness, that he was employed by the Bighorn Sheep Company, and that he made a timber and stone entry, which was not for himself, but was made either at the request of Mr. Okie or some one connected with the Bighorn Sheep Company, the witness not remembering the details; that he did not pay any of the expenses of the entry, had no personal interest in it, and was paid something for it, but does not remember the amount. The witness has no recollection of who made out the papers. The evidence of this witness also further shows that he had previously taken up a homestead entry himself at the instigation of no other person; that he proved up on it, and sold it to a third party not connected with the defendants in this case.

The next entry is that of John B. Wynn. This witness testified that he made the entry at the request of the defendant Okie, who paid all the expenses and filing fees and purchase price of the land, that the witness had no personal interest in the land, that he received $50 for it, and that it was selected by Mr. Okie. He further testified that there was timber and stone on the land, and that he expected it had value for stone.

The next entry is that of Edward G. Swain, who testifies as a witness before the master that he lived in the neighborhood of Lost Cabin for about 12 years, and that he does not remember for whom he was working at the time he made application for the entry. In regard to taking it up, he states that, as near as he can recollect, he took it up for the defendant Okie, and that he was paid $25, Okie paying the expenses of the entry, although the witness does not know but that these expenses might have been charged to him; that he had no personal interest in the land; that he does not know who selected it; that it was valuable for timber, having timber thereon suitable for building corrals; that there was very little water on it, but some grass. The witness has no distinct recollection of giving a deed or before whom it was acknowledged.

These 5 entries, as distinguished from the 10 which have previously been considered, may be said to furnish prima facie proof to warrant a sustaining of the charge of fraud. The evidence as to the fraudulent connection of the defendant Okie is, however, positively denied in his testimony. [6] The evidence as to the character of the land is very conflicting; the last entry discussed being apparently the only one taken up on account of the value of its timber, while the others were presumably taken up on

account of their value for stone. It is quite apparent, from the reading of the general testimony, even that of the special agents, that the lands are located in a rocky region, the most of them in or around the Bighorn Mountains, where rock exists in extreme quantities. I do not consider that the question of the proximity of a claim valuable for stone to a market for such stone is an element in the consideration of its value. In fact, this has been so passed upon in the case of Narver v. Eastman, 34 Land Dec. 123. Furthermore, the evidence in the case shows that the stone on some of these claims was used in building dams, and even the house of defendant Okie was built with stone taken from the vicinity of some of the claims.

In considering the character of the testimony as to the legitimacy of the entries for the purpose for which they purport to have been taken, weighing that of the entrymen themselves, together with the old resident ranchmen in that community, as against the testimony of the special agents, who are usually unskilled in land uses, I should be inclined to accept the testimony of the old-time residents of the community, where it is apparently not affected by any relationship with the defendants.

Before attempting to determine the validity or invalidity of these 5 entries, another question raised by counsel for defendant must be considered. This is the question of limitation and laches. The record shows that the most recent patent of any of the entries now under discussion was issued by the government on the 26th of July, 1909, while the suit here was not instituted until the 20th of July, 1916, after a lapse of nearly 7 years. The contention of defendants is now that the government is barred from its prosecution of all the entries which fall without that limitation of 6 years from and after the date of issuance of patent. This statute of limitations is the Act of March 3, 1891, 26 Stat. 1099 (Comp. St. § 5114), and reads as follows:

"Suits by the United States to vacate and annul any patent heretofore issued shall only be brought within five years from the passage of this act, and suits to vacate and annul patents hereafter issued shall only be brought within six years after the date of the issuance of such patents."

Over against this statute, however, is invoked the equitable rule that, in case of fraud, the statute only runs from the time of the discovery of the fraud, provided due diligence has been exercised in its discovery, or, in other words, the absence of laches. That the statute of limitations binds the United States, unless it brings itself within the equitable principle arising from the fraud and its discovery, is plainly set forth in the case of United States v. Diamond Coal Co., 255 U. S. 323, where at page 333 (41 S. Ct. 335, 337, 65 L. Ed. 660) the court says:

"Before testing the accuracy of the deductions from the averred facts upon which these conclusions are necessarily based, we dispose of a legal contention of the United States, that in any event the propositions were wrongfully applied, because under the statute laches in discovering the fraud could not be imputed to the United States. As the statute in express terms deals with the rights of the United States and bars them by the limitation which it prescribes, and as that bar would be effective unless the equitable principle arising from the fraud and its discovery be applied, it must follow, since the doctrine of laches is an inherent ingredient of the equitable principle in question, that the proposition is wholly without merit, because, on the one hand, it seeks to avoid the bar of the statute by invoking the equitable principle suspending its operation, and, on the other, rejects the fundamental principle upon which the equitable doctrine invoked can alone rest."

It is quite apparent that the bill in the case at bar follows closely the points mentioned in the last-cited case. In order to bring itself within the equitable rule, the plaintiff here has asserted in its bill that it did not discover the fraud until some time in the year 1910, when a letter was written by one Moe to the Interior Department, calling attention to some irregularities in connection with some desert entries of the defendant Okie, and further that the deeds from entrymen in the case were not placed upon the record promptly after their receipt by the defendant Bighorn Sheep Company, but reserved from recording, so as to conceal the fraud. In the Diamond Coal Company Case, the ruling of the court was that this was a sufficient averment of concealment of the fraud in connection with the rule enforcing diligence in discovery upon the government to entitle the plaintiff to a trial upon the merits, and for that reason the case was reversed by the Supreme Court, but the case was apparently never tried upon the merits.

The proofs here show that the deeds from the entrymen to the defendant company, in the case of the entries which are

now under consideration, were not recorded, so as to take them out of the statute of limitations. In other words, these deeds were recorded within 6 years of the date of the commencement of the suit. In explanation of this, the defendants offer testimony of the defendant Okie that the deeds were recorded only as convenience permitted; that deeds sent to the recording office were held up, some having been lost; and that he had generally adopted a policy of recording his deeds at a time when he could personally take them to the recorder's office. In addition to the explanation thus offered, the defendant has offered testimony tending to show that, for more than six years prior to the commencement of the suit, the Bighorn Sheep Company was in open and notorious possession of the land in controversy, claiming the same as owner thereof, and had returned the property for taxation in its own name, and paid taxes thereon. This testimony regarding the open and notorious possession and taxation of the property in the name of the defendant for a period of more than 6 years prior to the commencement of the suit does not seem to be controverted by the plaintiff.

The question is: Are these acts sufficient to impute notice to the government? Numerous authorities have been cited, among them some from the Supreme Court of the United States, which seem to hold that open and notorious possession is equivalent to registry of title. In Noyes v. Hall, 97 U. S. 34, at page 38 (24 L. Ed. 909), the rule is announced by the Supreme Court in the following language: "Record evidence of a conveyance operates as notice, and so may open possession; the rule being that actual, visible, and open possession is equivalent to registry. Cabeen v. Breckenridge, 48 Ill. 91; Dunlap v. Wilson, 32 Ill. 517; Bradley v. Snyder, 14 Ill. 263 [58 Am. Dec. 564]."

Again, in the case of Simmons v. Doran, 142 U. S. 417, the court at page 442 (12 S. Ct. 239, 247, 35 L. Ed. 1063) says: "Again, actual and unequivocal possession is notice, because it is incumbent on one who is about to purchase real estate to ascertain by whom and in what right it is held or occupied; and the neglect of this duty is one of the defaults which, unexplained, is equivalent to notice."

Some of the other cases cited by counsel are Lea v. Polk, 62 U. S. (21 How.) 493, 16 L. Ed. 203; Landes v. Brant, 10 How. 348, 13 L. Ed. 449; Horback v. Porter, 154 U. S. 549, 14 S. Ct. 1160, 18 L. Ed. 30; Higgins v. White, 118 Ill. 619, 8 N. E. 808.

If my predecessor is correct in his conclusion that, where the full period of limitation had elapsed from the date of the filing of the deeds from the entrymen to the defendant before the commencement of the suit, it will justify the dismissal of those entries to which that situation applies, it would seem that the construction of the courts as to the rule which governs open and notorious possession being in its nature equivalent to the recording of instruments should likewise dispose of the remaining timber and stone entries here under consideration and entitle them to dismissal, inasmuch as we have seen that the same rule must be applied to the United States as to other litigants.

[7] There is another rule contended for by counsel for defendants, however, which applies to a different phase of the effort of plaintiff to bring the case within the equitable rule requiring proof of diligence as to discovery of the alleged fraud. This contention is that the plaintiff has not only failed to plead facts sufficient to authorize the granting of the relief sought, but even has failed to prove the facts it has alleged in that regard. The bill alleges that the matter was first called to the attention of the Interior Department by the letter from Moe some time in the year 1910, referring to certain irregularities in desert entries; but the evidence in the case even fails to prove the letter affirmatively pleaded in attempting to establish the time of the discovery of the alleged fraud, and shows only that at some time subsequent to the time stated in 1910 investigation was begun by government agents. The Supreme Court has laid down the rule covering a situation of this kind in the case of Wood v. Carpenter, 101 U. S. 135, at page 140 (25 L. Ed. 807), where the following language is used:

"In this class of cases the plaintiff is held to stringent rules of pleading and evidence, 'and especially must there be distinct averments as to the time when the fraud, mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly see whether, by ordinary diligence, the discovery might not have been before made.' Stearns v. Page, 7 How. 819, 829 [12 L. Ed. 928]. 'This is necessary to enable the defendant to meet the fraud and the time of its discovery.' Moore v. Greene et al., 19 How. 69, 72 [15 L. Ed. 533]. The same rules were again laid down in Beaubien v. Beaubien, 23 How. 190 [16 L. Ed. 484], and in Badger v. Badger, 2 Wall. 95 [17 L. Ed. 836]. A general allegation of ignorance at

one time and of knowledge at another are of no effect. If the plaintiff made any particular discovery, it should be stated when it was made, what it was, how it was made, and why it was not made sooner. Carr v. Hilton, 1 Curt. C. C. 220 [Fed. Cas. No. 2436]. The fraud intended by the section which shall arrest the running of the statute must be one that is secret and concealed, and not one that is patent or known. Martin, Assignee, etc., v. Smith, 1 Dill. 85 [Fed. Cas. No. 9164], and the authorities cited. 'Whatever is notice enough to excite attention, and put the party on his guard, and call for inquiry, is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it.' Kennedy v. Greene, 3 Myl. & K. 722. 'The presumption is that if the party affected by any fraudulent transaction or management might, with ordinary care and attention, have seasonably detected it, he seasonably had actual knowledge of it.' Angell, Lim. § 187, and note. A party seeking to avoid the bar of the statute on account of fraud must aver and show that he used due diligence to detect it, and if he had the means of discovery in his power, he will be held to have known it. Buckner & Stanton v. Calcote, 28 Miss. 432, 434. See, also, Nudd v. Hamblin, 8 Allen (Mass.) 130."

In Stearns v. Page, 7 How. 819, at page 829 (12 L. Ed. 928), the interrelationship between limitations and laches is very clearly set forth, as well as the elements which are necessary in equity to take a case out of the statute of limitations:

"Statutes of limitation form a part of the legislation of every government, and are necessary to the peace and repose of society. When they are addressed to courts of equity as well as to courts of law, as they seem to be in all cases of concurrent jurisdiction (as in matters of account), they are equally obligatory on each court. In other cases, courts of equity act upon the analogy of limitations at law, and sometimes upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands, by refusing to interfere where there has been gross laches or unreasonable delay. They also interfere in many cases to prevent the bar of the statutes, where it would be inequitable or unjust; as, for example, if a party has perpetrated a fraud which has not been discovered till the statutable bar may apply to it in law, courts of equity will interpose and remove the bar out of the way of the injured party. In cases of mistake also, as well as fraud, they will not consider the statute as running till after the discovery of the mistake, as laches cannot be imputed to the injured party till the discovery of the fraud or mistake has been made. 2 Story's Eq. par. 1520. But as lapse of time necessarily obscures the truth and destroys the evidence of past transactions, courts of chancery will exercise great caution in sustaining bills which seek to disturb them. They will hold the complainant to stringent rules of pleading and evidence, and require him to make out a clear case. Charges of fraud are easily made, and lapse of time affords no reason for relaxing the rules of evidence or treating mere suspicion as proof. If a defendant can be compelled to open settled accounts, to explain or prove each item, after a lapse of near thirty years, by general allegations of fraud—if the fraud can be proved by his inability to elucidate past transactions after so great a length of time, or by showing some slips of recollections, or by contradicting him in some collateral facts by the frail recollection of other witnesses—no man's property or reputation would be safe. A complainant, seeking the aid of a court of chancery under such circumstances, must state in his bill distinctly the particular act of fraud, misrepresentation, or concealment—must specify how, when, and in what manner it was perpetrated. The charges must be definite and reasonably certain, capable of proof, and clearly proved. If a mistake is alleged, it must be stated with precision, and made apparent, so that the court may rectify it with a feeling of certainty that they are not committing another, and perhaps greater, mistake. And especially must there be distinct averments as to the time when the fraud, mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly see whether, by the exercise of ordinary diligence, the discovery might not have been before made."

If there be a question about the sufficiency of pleading as to the time of the discovery of the alleged fraud, what can be said of the situation presented when the proofs even fail to sustain the purported time of discovery alleged in the bill? Therefore, even if the evidence be considered as, being sufficient to establish fraud in regard to the 5 timber and stone entries, which is questionable, the other elements necessary to take them out of the statute of limitations are not present in the proofs. These entries must therefore be dismissed out.

It may be said, in passing, that the rule which has been applied to the timber and stone entries which are here under discussion concerning the limitations and laches applies to all entries in the case, with the exception of some of the isolated tracts, which will now be considered.

[8] I am of the opinion that the case as to the isolated tracts cannot be sustained. The gist of the charge of fraud in respect to these tracts is that the defendants by conspiracy and fraud brought into existence other classes of entries for the purpose of creating isolated tracts. Outside of the fact that some of the entries challenged did create isolated tracts, I have found nothing in the evidence which lends support to the theory that the other classes of entries were sought to be taken up for the purpose of creating isolated tracts, and my attention has been called to no evidence of this character. It would seem that, to establish proof of a fraud of this character, it would be necessary to have some evidence that the other entries were being sought for the purpose of establishing these tracts. Furthermore, these tracts under the law are put upon a basis of purchase and sale at public auction, when ordered into the market by the Interior Department, at a minimum price fixed by the act. And under a later amendment, applying to some of the tracts here involved, it is not even necessary that they be isolated. There is nothing in any of the acts providing for the sale of these tracts which requires any prospective purchaser to apply for it for his own use, and the substance of the testimony which is in any way offered to sustain charge of fraud is that some of these applicants say that they were requested by the defendant Okie to apply for purchase.

Again it appears that 6 of those isolated tracts were patented more than 6 years before the beginning of the suit, and that during all of that time defendant had open and notorious possession of and paid taxes upon them. This number would fall within the rule applied to the government in not having brought itself within the equitable principle heretofore discussed.

One of the most striking reasons that this principle should properly be invoked against the plaintiff here is that while, for the purpose of taking itself out of the statute of limitations, it pleads a discovery of the fraud some time in 1910. The record shows that subsequent to that date there were 5 patents for isolated tracts issued to defendants John B. Okie and Clarice V. Okie, two of them nearly two years after the alleged discovery of fraud. The fact that, after the alleged discovery of the fraud in the matter of isolated tracts, the plaintiff continued to issue patents for isolated tracts in the community to the defendants themselves for a period of nearly two years, indicates either that there was no fraud discovered, or that the plaintiff was so exceedingly lax in pursuing its cause that it should be entitled to no particular consideration in a court of equity, where the relief must be based upon a showing of diligence after notice.

[9] Counsel for plaintiff place stress upon a portion of the evidence, which shows that the commissioners before whom proof was taken were in the employ of the defendant Okie, and that the fees earned by them were turned in to the defendant company; but, in face of the fact that these commissioners were paid stated monthly salaries by the defendant company covering their entire time, I fail to see where this would become a badge of fraud. Neither does the fact that the handwriting of the defendant Okie appears in some of the applications for entry lend much strength to the charges, in view of the fact that it was conclusively shown that the defendant Okie was the best-informed man on land matters in that vicinity, which was a very great distance from any place where there were banks or lawyers, and that it was the general custom in that community for prospective applicants for public lands to seek the aid of the defendant Okie in securing descriptions, locations, and in making out land papers. The circumstance in itself that lands in the vicinity of the defendant's ranch eventually became a part of it is not an unusual circumstance in the Rocky Mountain region. The fact is that in many localities of the West, where in more recent years dry farming was attempted and the venture found unprofitable, titles to these lands were acquired by the nearby ranchers. There was no fraud in these transactions, as in many instances the original incoming of the homesteader and other small entrymen was resented by the stockman. It is equally true of homestead, desert, and timber and stone entries taken up by those seeking to start in the stock business, who eventually yield to natural forces, and sell out their holdings to those who are by nature better equipped to withstand the hardships of frontier life.

For the reasons stated, in addition to the entries in the bill heretofore dismissed by Judge Riner, the remaining entries and the bill itself will be dismissed, reserving to plaintiff its proper exceptions in the premises.